UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.          **DECISION AND ORDER**

ROBERT MORGAN, FRANK GIACOBBE,   1:18-CR-00108 EAW
TODD MORGAN, and MICHAEL
TREMITI,

      Defendants.
_____

   Defendants Robert Morgan, Frank Giacobbe, Todd Morgan, and Michael Tremiti

(hereinafter collectively "Defendants") stand accused by way of a 114-count Superseding

Indictment returned by a federal grand jury on May 21, 2019, with a scheme spanning over

a decade to defraud financial institutions and government-sponsored enterprises Freddie

Mac and Fannie Mae in connection with the financing of multi-family residential apartment

properties managed by Morgan Management, LLC ("Morgan Management"), and owned

by various limited liability companies controlled by defendant Robert Morgan, as well as

a related insurance fraud scheme charged against defendants Robert and Todd Morgan,

spanning a more limited time period.  (Dkt. 42).  Defendants seek to dismiss the

Superseding Indictment on the grounds that their statutory and constitutional rights to a

speedy trial have been violated.  (Dkt. 216; Dkt. 231; Dkt. 234; Dkt. 237).

   The Court recognizes at the outset that the government has mishandled discovery in

this case—that fact is self-evident and cannot be reasonably disputed.  It is not clear

whether the government's missteps are due to insufficient resources dedicated to the case,

a lack of experience or expertise, an apathetic approach to the prosecution of this case, or perhaps a combination of all of the above. However, it is clear that the government's mistakes, while negligent, do not constitute willful misconduct undertaken in bad faith.

Ultimately, the government's failures to meet court-imposed deadlines prompted the Magistrate Judge to condition the exclusion of time from the speedy trial clock on the government's production of discovery by a certain deadline—and the government blew that deadline. The government "missed" and failed to process several devices seized pursuant to a search warrant executed in May 2018. As a result, the statutory speedy trial clock has expired, and the Superseding Indictment must be dismissed.

However, after careful consideration, including a detailed analysis of the adequacy of the government's electronic discovery production, the Court concludes that a dismissal with prejudice is unwarranted. The Court further concludes that Defendants' constitutional rights to a speedy trial have not been violated. Accordingly, the Superseding Indictment is dismissed without prejudice.

## I.    BACKGROUND

### A.    Initial Indictment and Request to Extend Voluntary Discovery Deadline

The government originally filed charges in this case on May 22, 2018, by way of an Indictment returned against defendants Frank Giacobbe, Todd Morgan, and two others who have since pleaded guilty. (Dkt. 1; *see* Dkt. 30 (defendant Kevin Morgan plea agreement); Dkt. 36 (defendant Patrick Ogiony plea agreement)). The case was originally assigned to

District Judge Lawrence J. Vilardo,[1] who issued a referral order to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 18 U.S.C. §§ 636(b)(1)(A) and (b)(1)(B).  (Dkt. 3). Defendant Frank Giacobbe was arraigned before Magistrate Judge Schroeder on May 23, 2018 (*see* 5/23/2018 Minute Entry), and defendant Todd Morgan was arraigned the following day (*see* 5/24/2018 Minute Entry).  Magistrate Judge Schroeder issued a Scheduling Order requiring the completion of voluntary discovery by July 27, 2018, and the filing of pretrial motions by January 25, 2019, and with the parties' consent, he granted an exclusion of time from the speedy trial clock from the date of the Scheduling Order (May 29, 2018) until the date for the filing of pretrial motions (January 25, 2019), pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (B)(iv).  (Dkt. 16; *see also* 5/23/2018 and 5/24/2018 Minute Entries).

On July 27, 2018—the deadline set by Judge Schroeder for the completion of voluntary discovery—the government filed a motion to extend that deadline by 120 days. (Dkt. 19).  The government largely attributed the need for additional time to the volume of data seized by the government during execution of a search warrant shortly before the return of the Indictment at the offices of Morgan Management and Frontier Cybercenter. (*Id.* at 4-5).  Specifically, on May 14 and 15, 2018, the government seized pursuant to a search warrant eight computers, two iPhones, and five external hard drives (including the Barracuda Message Archiver) from the offices of Morgan Management.  (*See* Dkt. 157-1 at 86-97).  Additional electronic information was obtained from Frontier Cybercenter,

---

[1]     On May 29, 2018, Judge Vilardo recused himself and the case was reassigned to the undersigned.  (Dkt. 14).

where Morgan Management maintained certain servers and computers.  (Dkt. 19 at 4; *see* Dkt. 157-1 at 91-92, 96).

A status conference was conducted before Magistrate Judge Schroeder on August 6, 2018.  (Dkt. 23; *see* 8/6/2018 Minute Entry).  The government explained that the volume of materials seized in May 2018 pursuant to the search warrant, necessitated the government putting in place a different document management system to handle the electronically stored information ("ESI"), and this resulted in delays in the production of even the pre-search warrant material.  (Dkt. 23 at 3-4, 9, 12).  The government reiterated its position set forth in its written motion that the 120-day extension of time would be sufficient to complete voluntary discovery.  (*Id.* at 19).

At the time, Magistrate Judge Schroeder raised speedy trial concerns:

MAGISTRATE JUDGE:  But do you now realize the conundrum the government's creating in the context of speedy trial?

AUSA PENROSE:  Yes, Judge.

(*Id.* at 27).  Instead of granting the government the full 120-day extension requested, the Magistrate Judge set a deadline of August 24, 2018 for the government to provide pre-search warrant data to the defense (*id.* at 21), and further required that the government complete its processing of the search warrant material by September 28, 2018, and turn over Rule 16 material from the search warrant material by October 12, 2018 (*id.* at 32; *see also* 8/6/2018 Minute Entry).  In addition, he scheduled a status conference for October 31, 2018, at which time it was contemplated that a new scheduling order for pretrial motions would be discussed.  (Dkt. 23 at 33, 36-37).  The parties agreed that the speedy trial clock

remained stopped through January 24, 2019, pursuant to the original Scheduling Order. (*Id*. at 37).

      B.      October 31, 2018 Status Conference and Document Production Protocol

In advance of the October 31, 2018 status conference, counsel for Todd Morgan, David Rothenberg, Esq., filed a report on October 29, 2018, contending that the government had failed to comply with the Magistrate Judge's deadlines because discovery seized pursuant to the May 2018 search warrant still had not been produced, and the electronic discovery that had been produced contained technical deficiencies. (Dkt. 24 at 3). Mr. Rothenberg stated that no discovery had been produced from many of the devices that were seized pursuant to the May 14, 2018 search warrant. (*Id*. at 4-6).

A status conference was conducted before Magistrate Judge Schroeder on October 31, 2018. (Dkt. 184; *see* 10/31/2018 Minute Entry). At the outset of that conference, the Magistrate Judge stated that he was "very disturbed by the government's—I won't call it foot dragging, incompetent may be too strong a term, but it seems to me that this is a problem that is being created by the government's inability to do what it's supposed to do." (Dkt. 184 at 3). The government disagreed with defense counsel's claim that there were technical deficiencies with the electronic discovery. (*Id*. at 3-5). The government also represented at that conference that it had produced all discovery other than that which had hit on a privilege term and was going through the filter review process,[2] although it

---

[2]     The government explained at the October 31, 2018 conference that the issue of the use of a filter team was litigated before the undersigned, *see Grand Atlas Property Management v. United States*, Case No. 1:18-mc-00030-EAW, and that the government

admitted that it had only completed that production that day and did not meet the Magistrate Judge's deadline of October 12, 2018.  (*Id.* at 6-7).

Mr. Rothenberg countered that, in fact, there were multiple technical deficiencies with the electronic discovery, leading him to conclude that "whatever vender they are working with is incompetent and producing these things in a manner that makes it close to impossible for us to use."  (*Id.* at 9-12).  Mr. Rothenberg raised the issue of whether a motion to dismiss the indictment should be filed because of the government's failure to comply with the deadline for production of voluntary discovery,[3] prompting the following response:

> MAGISTRATE JUDGE:   Well, that would be a pretty severe sanction. Obviously I'm not talking off the top of my head, I'm not indicating in any way what the outcome of such a motion would be.  I do know that all I could do would be a Report and Recommendation, since it would be a Motion to Dismiss, and that would be for the district judge to whom the case is assigned to actually pass on the merits.  But I am struggling with this problem of a carrot and a stick and not having an appropriate stick by which I can apparently get at least the government to comply with my scheduling order. One thought that came into my mind, but I'm not sure it would resolve anything other than create even further problems would be to say, all right, by reason of the delay that is attributed the government, allegedly, the time will not be excluded while we finish up this production.  But that time could run maybe longer than 70 days.

---

had not anticipated that litigation, which in part led to delays with review by the filter team. (Dkt. 184 at 7-9).

[3]     Mr. Rothenberg made it clear that the motion would not be based on a violation of the Speedy Trial Act, but rather based on violating Magistrate Judge Schroeder's scheduling orders.  (Dkt. 184 at 28).  But he ultimately agreed during the appearance to "abandon" that argument.  (*Id.*).

(*Id*. at 17-18).  Although the Magistrate Judge further indicated at that appearance that he needed "the threat of a club" (*id*. at 28), he ultimately did not implement any such "club" but rather, with the consent of all defense counsel, extended the deadlines for discovery compliance and pretrial motion filings, and further directed the parties to agree upon a document production protocol for electronic discovery (*id*. at 28-30).

An Amended Scheduling Order was entered on the docket that same day, extending the deadline for pretrial motions to June 28, 2019, and excluding the time from the speedy trial clock through that date pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (B)(iv).  (Dkt. 25).  On December 19, 2018, the government filed a status report attaching the agreed-upon document production protocol for electronic discovery.  (Dkt. 27; *see* Dkt. 27-1 (document entitled "Data Delivery Standards" constituting the document production protocol, hereinafter referred to as "the DPP")).[4]

C.    The Status Conference before the Magistrate Judge on May 29, 2019

On May 21, 2019, the Superseding Indictment was returned, adding additional charges and two additional defendants—Robert Morgan and Michael Tremiti.  (Dkt. 42).  After arraignments were conducted before the duty magistrate judge (Dkt. 45), a status conference was conducted before Magistrate Judge Schroeder on May 29, 2019 (Dkt. 53; *see* 5/29/19 Minute Entry).  At that conference, the government requested 60 days to

---

[4]    It appears that the DPP was only expressly agreed upon by the government and counsel for defendants Todd Morgan and Kevin Morgan.  (Dkt. 27 at 2).  However, the Magistrate Judge indicated at the appearance on October 31, 2018, that the DPP was to be the "established protocol for the remainder of this case," (Dkt. 184 at 13), and nothing in the record suggests that any defendant, including those added with the Superseding Indictment, objected to the terms of the DPP.

provide voluntary discovery related to the Superseding Indictment and the Magistrate Judge questioned the need for that amount of time.  (Dkt. 53 at 6-8).  The government explained that it could make the previously-produced discovery immediately available to the newly added defendants, but it was requesting the 60 days as a "cautious estimate" of the time needed to "provide all discovery in the government's possession . . . in accordance with the protocols that have been provided to the parties."  (*Id*. at 9).  Magistrate Judge Schroeder raised concerns about the government's request for 60 days to provide voluntary discovery, and the following exchange occurred:

> MAGISTRATE JUDGE:  All right.  I don't want to piece meal this thing as we did under the original indictment by having to hold status conferences when the government did not meet the original dates that were set, but I also need to have some sort of control and, put it point blank and bluntly, a club.  And *what I'm contemplating* is if I give the government 60 days, *and it doesn't meet the deadline of providing the discovery material, the time thereafter that it takes for the government to get that material to the defendants will count against the government for purposes of speedy trial requirements, which means the clock will start running as to the government*.
>
> Now, at the same time, I'm well aware that defense counsel is going to also claim, however, that they need whatever time they are going to claim they need once the discovery material is turned over.  But the bottom line is that once all of the pretrial motions have been completed, if the government has been penalized, so to speak, in losing time that it's entitled to for purposes of being ready for trial, that still would apply.  *For example if all of the pretrial motions have been resolved, and any other issues have been resolved, and the government was 10 days late in getting the discovery material, the government's time for going to trial is going to be reduced by that 10-day period*.
>
> AUSA PENROSE:   Your Honor, *I think that makes sense* and *the government certainly has no objection*.  *I would just like to clarify that that would be with respect to any evidence subject to discovery currently in the government's possession*.  Obviously, the government has continuing discovery obligations.

> MAGISTRATE JUDGE:  Right.  I'm talking about what we're talking about as being produced now.
>
> AUSA PENROSE:  Understood.
>
> MAGISTRATE JUDGE:  *That which is in the government's possession, which is being put together pursuant to a protocol*.

(*Id*. at 14-15 (emphasis added)).

The discussion then turned to how much time defense counsel would need to file pretrial motions, and when counsel for defendant Michael Tremiti raised questions as to the volume of discovery that had already been produced (*id*. at 18), Mr. Rothenberg (counsel for Todd Morgan) offered to "assist" by explaining the volume of documents received to date and indicating that those documents "*arrived here, finally, in the proper format, my recollection is sometime in February*, and it is a monumental task to go through this volume of documents" (*id*. at 19-20 (emphasis added)).  The Magistrate Judge engaged in further discussions about the schedule, ultimately agreeing to allow Defendants six months from the voluntary discovery deadline to file pretrial motions (although at least one defense counsel asked for additional time).  (*Id*. at 21-26).  The Magistrate Judge then asked certain questions and made certain findings concerning the exclusion of time from the speedy trial clock, as follows:

> MAGISTRATE JUDGE:  Now, as to the Defendant Giacobbe, Mr. Greenman, is it his position that the time between now and January 31st, 2020 will, in fact, be utilized in such a way so as to operate and enure to his benefit, and, therefore, such time should be excluded for purposes of the Speedy Trial Act?
>
> MR. GREENMAN: Yes, your Honor.

MAGISTRATE JUDGE:  Mr. Rothenberg, on behalf of the defendant, Todd Morgan, is it his position that the time between now and January 31st, 2020 will be utilized in such a way as to operate and enure to his benefit, and, therefore, such time should be excluded for purposes of the Speedy Trial Act?

MR. ROTHENBERG:  Yes, your Honor, *but subject to your Honor's previous indication about the consequences of the government not complying with the 60-day voluntary discovery deadline*, but otherwise, yes, your Honor.

MAGISTRATE JUDGE:  And, Mr. Thompson, as to the Defendant Tremiti, is it his position that the time between now and January 31st, 2020 will, in fact, be utilized in such a way as to operate and enure to his benefit, and, therefore, such time should be excluded for purposes of the Speedy Trial Act?

MR. THOMPSON:   Yes, your Honor.

MAGISTRATE JUDGE:  Mr. Cohen and Mr. Robert Morgan, I will address that exclusion of time issue with Mr. Morgan's counsel, hopefully, on June 10, 2019.[5]

MR. COHEN:  Understood, your Honor.  Thank you.

MAGISTRATE JUDGE:  All right.  Counsel for the government, is it the government's position with respect to each individual defendant's case that the time between now and January 31st, 2020, will operate in the interest of justice in each individual defendant's case, and, therefore, such time should be excluded for purposes of the Speedy Trial Act *subject to the condition that I imposed as far as meeting the discovery deadlines* are concerned?

AUSA FABIAN:  Yes, your Honor.

---

[5]    Counsel for Robert Morgan, Joel Cohen, Esq., of the law firm Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), appeared only provisionally on May 29, 2019, and the Magistrate Judge scheduled an appearance for June 10, 2019, to address the issue of counsel.  (Dkt. 53 at 9-13, 29-30).  However, that appearance was "stayed" due to separate litigation commenced by the Securities and Exchange Commission ("SEC") against Mr. Morgan.  (Dkt. 56; Dkt. 57).  Ultimately, on July 31, 2019, Mr. Cohen and additional attorneys with Gibson Dunn filed notices of appearance on Robert Morgan's behalf.  (Dkt. 106; Dkt. 107; Dkt. 108; *see also* Dkt. 150 at 52 (Mr. Cohen confirming that Gibson Dunn had been fully retained on behalf of defendant Robert Morgan)).

MAGISTRATE JUDGE:  Based on the representations made by counsel for the respective parties herein, I find that the time between now and January 31st, 2020, will, in fact, be utilized in such a way so as to operate and enure to the benefit of each defendant, individually, as well as operate in the interest of justice in each individual defendant's case in that such time is going to be utilized to allow the government sufficient time within which to provide voluntary discovery material to each defendant, and, thereafter, give each defense counsel sufficient time within which to review the material provided, as well as time to prepare in the representation of each defendant so as to provide each defendant with effective assistance of counsel, that being each defendant's constitutional right, which right outweighs the public's right or interest to a speedy trial or disposition in this matter.  Further, such time will be utilized by the parties for the purpose of conducting pretrial negotiations with the objective of reaching an agreement that will dispose of this matter without the necessity of a trial.  And should that objective be accomplished, the public will also benefit from same in that it will be spared the cost and expenditure of resources that would be necessitated in the holding of a trial and possible appeal.  For all of those reasons then, the time is justifiably and validly excludable, and is hereby so excluded, pursuant to and in accordance with the provisions contained in Title 18 of the United States Code Section 3161(h)(7)(A) and section 3161(h)(7)(B)(4).

(*Id.* at 53 at 26-29 (emphasis added)).

On May 29, 2019, a Scheduling Order was filed memorializing the deadlines discussed during the status conference on that same date, confirming that all voluntary discovery must be produced by July 31, 2019, and that pretrial motions must be filed by January 31, 2020.  (Dkt. 50).  The written Scheduling Order confirmed that time had been excluded from the speedy trial clock from May 29, 2019, through January 31, 2020, "for the reasons stated on the record herein," although there was nothing in writing expressly addressing the clock running if the government failed to provide discovery by the July 31, 2019 deadline.  (*Id.* at 2).

D.    Defendant Robert Morgan's November 2019 Motion to Extend
       Pretrial Motion Deadline and Disclosure by Government of Missing
       "Laptops"

On November 15, 2019, defendant Robert Morgan filed a motion for a six-month

extension of time to file pretrial motions.  (Dkt. 138).  Defendants Todd Morgan and Frank

Giacobbe consented to the requested extension, but defendant Michael Tremiti initially did

not and the government also opposed the request.  (Dkt. 138-3 at 1).  In support of that

motion, counsel stated that the government made its first and only production of voluntary

discovery to defendant Robert Morgan on August 8, 2019,[6] described as "massive" and

"containing over 2.1 million pages of discovery," not including a subset of 886,500

documents missing "necessary load files."  (*Id.* at 7).  The government filed a response in

opposition to the motion, pointing out that the alleged load file issue was never raised by

counsel for defendant Robert Morgan until October 30, 2019, and the government

remediated the issue in less than one week afterwards.  (Dkt. 143-1 at ¶¶ 12-14).  Moreover,

the government disputed that load files were not provided, explaining in a sworn affidavit

---

[6]      The record supports the conclusion that the government repeatedly followed up with
counsel for Robert Morgan in an effort to produce discovery by the deadline of July 31,
2019, but it was not until August 1, 2019, after Gibson Dunn confirmed that it had been
fully retained, that a hard drive was provided to the government for purposes of providing
discovery.  (Dkt. 143-1 at ¶¶ 4, 6, 7-8).  The government began copying the data to the hard
drive, but because of its volume, the process was not completed until August 8, 2019, at
which point the hard drive was sent to Gibson Dunn by overnight delivery.  (*Id.* at ¶ 8).
Although the Magistrate Judge's order required the production of voluntary discovery by
July 31, 2019, the Court would be hard-pressed to conclude that the government's
production of discovery to Gibson Dunn on August 8, 2019 somehow violated that order
given the circumstances, and defendant Robert Morgan does not seriously argue otherwise.
In any event, the eight days at issue do not impact the Court's resolution of these motions.

that it used a computer program called "Beyond Compare" to copy the various electronic document productions from government servers to the hard drive provided by counsel for Robert Morgan. (*Id.* at ¶ 10). According to the sworn affidavit, this "program allows a user to compare the files that are being copied to the original source files and identifies any differences between the two sets of files," and there were no differences identified during this process. (*Id.*). Moreover, the government's copy of the productions included the necessary load files. (*Id.*). Thus, the government opined that any missing load file was likely caused by corruption that occurred during copying/loading of the productions to the Gibson Dunn servers. (*Id.*).

The government also explained that neither counsel for Todd Morgan nor counsel for Frank Giacobbe[7] had contacted the government concerning any issue with respect to discovery after it was provided on July 31, 2019. (*Id.* at ¶ 16). Similarly, prior to the November 25, 2019 status conference, the government was unaware of any issue that counsel for Michael Tremiti was having with respect to the government's productions. (*See* Dkt. 262-1 at ¶¶ 25-27).

Also included in the government's response to defendant Robert Morgan's motion for an extension of time was a statement in its memorandum of law that "on approximately the same date that counsel filed the current motion to adjourn, counsel for the government

---

[7]     The record shows that counsel for defendant Frank Giacobbe expressed his desire not to receive the volume of discovery provided to other defendants because of the costs related to maintaining and reviewing the discovery, and instead, at his request, has received smaller batches of documents. (*See* Dkt. 262-1 at ¶¶ 19-23).

identified images of three laptop hard drives" seized during the May 2018 search warrant, that had not been previously produced.  (Dkt. 143 at 5).  The government suggested that "because emails and business documents from Morgan Management's servers were already part of the discovery production, it is likely that many or most of the items on the laptops are duplicative of items already produced."  (*Id.* at 5-6).[8]

A status conference was held before the undersigned on November 25, 2019.  (Dkt. 145; Dkt. 150).  At that time, the Court raised questions as to why defense counsel had delayed raising any issues concerning discovery provided over three months earlier.  (*See* Dkt. 150 at 5-6 (counsel from Gibson Dunn indicating that it was a lengthy process to upload the documents, but conceding that they were "inundated with criminal and civil forfeiture issues" and ongoing discussions concerning real property transactions, but "as soon as we were able to turn to the discovery issue, we promptly alerted the government.")).  Counsel for Todd Morgan also reported issues with respect to the electronic discovery based on checking with his vendor "this morning," (*id.* at 7), and when questioned by the Court as to why he did not raise these issues earlier, he responded:

> There seemed to me personally there was no point to try and resolve this on behalf of Todd alone.  Until we had the entire defense team assembled and present and quite frankly, the resources of Gibson Dunn, it didn't seem to me to be a worthwhile exercise.

---

[8]    It was clarified at a later status conference that the three "laptop" computers actually consisted of a desktop computer used by Kristy Trombley, a laptop computer used by Paul White, and a laptop computer used by defendant Michael Tremiti.  (Dkt. 228 at 26).

(*Id.* at 9).[9]

The government conceded at the November 25, 2019 status conference that the three "laptops" had been "missed." (*Id.* at 30). The Court indicated that the government needed to identify what was contained on those laptops that fell within the scope of Rule 16 that had not been previously produced, and the government agreed. (*Id.* at 31). Counsel for defendant Robert Morgan described the revelation of the missing laptops as a "bombshell" and indicated his intention to file a motion to dismiss for a violation of the Speedy Trial Act based on the Magistrate Judge's conditional exclusion of time requiring discovery to be produced by July 31, 2019. (*Id.* at 16-19).

The Court did not rule on the motion to extend the pretrial motion deadline at the November 25, 2019 status conference, but instead directed the parties to work with each other to address any outstanding issues with respect to the electronic discovery, and scheduled a further status conference for December 20, 2019, where each party was directed to attend with an information technology ("IT") person knowledgeable about the electronic discovery issues if they remained unresolved. (*See* Dkt. 145). The Court also

---

[9]     On February 5, 2019, AUSA Penrose emailed counsel for defendant Todd Morgan asking whether the government's recent production after negotiation of the DPP had provided the functionality requested, and counsel responded that they were still processing the production but would "let [the government] know later in the week if we discovered any issues and whether it functions as we hope it will." (Dkt. 262-1 at ¶ 31). Counsel for defendant Todd Morgan never raised any issues concerning the adequacy of the government's electronic discovery after agreement on the DPP until he stated concerns for the first time almost ten months later at the status conference before the Court on November 25, 2019. (*Id.* at ¶¶ 31-36). In fact, at the appearance before Magistrate Judge Schroeder on May 29, 2019, counsel for Todd Morgan represented that the discovery had arrived "in the proper format" in February. (Dkt. 53 at 19-20).

conferred with all counsel regarding a trial date and, with no objection from any party, scheduled a trial date of January 11, 2021.  (*See* Dkt. 147).

E.      December 20, 2019 Status Conference

A further status conference was held before the undersigned on December 20, 2019. (Dkt. 167; Dkt. 182).  Only the government complied with the Court's direction to have an IT person present.  (Dkt. 182 at 2-5).  At that conference, counsel for defendant Robert Morgan represented that all metadata issues they had identified had been resolved except for the missing file extension issues and some minor issues with 100 or so documents.  (*Id.* at 7-8, 11).  With respect to the missing file extension data, the government represented that its database also did not have file extensions for the identified documents, and that a large number of the identified documents came from "container files" and the files stored therein would not have file extensions.  (*Id.* at 9-10).

The Court set deadlines at the December 20, 2019 status conference for Defendants' anticipated motions to dismiss on speedy trial grounds, which were confirmed by a Text Order issued that same day.   (Dkt. 168).  The Court also issued a Scheduling Order confirming various deadlines pertaining to outstanding discovery issues identified at that status conference. (Dkt. 169).   The Court's Scheduling Order further set deadlines for compliance with its instructions, given at the status conference, for defense counsel to

provide logs of missing metadata to the government and the government to provide overlay files in an attempt to remedy any missing metadata issues.  (*Id.*).[10]

In advance of the status conference, the government had disclosed by letter dated December 17, 2019, that as part of its investigation, it had been speaking with Larry Hill, former Chief Financial Officer of Morgan Management, who disclosed that he had in his possession a backup server of Morgan Management that he had kept in his basement and intended to dispose of because he was ill with cancer.  (Dkt. 157-1 at 124).  The government took possession of the server in October 2019, and while it did not intend to use any of the data or information from the server, it was arranging to make the contents available to defense counsel "as quickly as the technology involved will allow," but those efforts had been complicated by the need to equip the facility with connections that would enable the government to "power up the server and bring it back online."  (*Id.* at 124-25).

F.    January 27, 2020 Status Conference

A further status conference was held before the undersigned on January 27, 2020. (Dkt. 201; Dkt. 228).  Among the issues addressed at that status conference was defendant Todd Morgan's iPhone, which was seized during execution of the May 2018 search warrant but never turned over to the filter team for privilege review, and therefore no materials from that iPhone had been produced to Defendants.  (*See* Dkt. 228 at 45-49; *see also* Dkt. 197 at 5).  The government initially represented that records from the iPhone had been

---

[10]    The parties have stipulated as to the timing and content of log files provided by Defendants and overlay files provided by the government, occurring between December 2019 and March 2020.  (Dkt. 436 at 2-5).

produced, but when asked by counsel for defendant Robert Morgan to identify where material from the iPhone existed within the electronic discovery, the government ultimately disclosed on January 6, 2020, that, in fact, the iPhone had *not* been processed and therefore discovery from it had not been produced.  (Dkt. 216-1 at ¶ 13; *see also* Dkt. 231 at ¶ 35 ("[I]t was not until January of 2020 that the government first disclosed that it had never produced the contents of Todd Morgan's phone.")).

Also discussed at the January 27, 2020 status conference was information obtained from defendant Todd Morgan's vendor identifying various metadata in the native files produced by the government—metadata that the government claimed did not exist.  (*See* Dkt. 200).  This led counsel for Robert Morgan to indicate that their prior representation that the metadata issues had been resolved was based on the government's representation that the missing metadata was not retrievable, but they now questioned the accuracy of that information.   (Dkt. 228 at 9-10).  A further topic of discussion was the fact that the government did not provide custodian information for the electronic discovery of the three missing "laptops" in the same form it had provided the information previously, although the government indicated it was prepared to provide an overlay file with that information. (*Id*. at 26-29).  At that conference the government also indicated that, after initially forgetting that it had represented to the Court that it would identify documents contained in the production of the three "laptops" that had not been previously produced, it was still in the process of attempting to do that.  (*Id*. at 29-31).

On January 28, 2020, the Court issued a Scheduling Order that, among other things, set forth a schedule for an evidentiary hearing to commence on March 30, 2020, which the

Court indicated would likely be necessary to resolve the remaining disputes concerning discovery that would be the subject of the contemplated speedy trial motions.  (Dkt. 202).

G.    Speedy Trial Motions

On January 31, 2020, defendant Robert Morgan filed his motion to dismiss on speedy trial grounds.  (Dkt. 216; Dkt. 217; Dkt. 220).  Defendant Robert Morgan argues that the Superseding Indictment should be dismissed with prejudice due to violations of the Speedy Trial Act and his constitutional right to a speedy trial.  (*Id.*).  On February 6, 2020, defendant Todd Morgan filed his own speedy trial motion (Dkt. 231), and the next day defendants Michael Tremiti and Frank Giacobbe both filed their own motions (Dkt. 234 (Tremiti motion); Dkt. 237 (Giacobbe motion)).

By Text Order entered on February 7, 2020, after an appearance on February 5, 2020, the Court granted the motion to extend the deadline for Defendants to file pretrial motions in part, extending the deadline to May 8, 2020.  (Dkt. 235).

In accordance with the schedule set by the Court, defendants Robert Morgan, Todd Morgan, and Michael Tremiti filed memoranda on February 14, 2020, concerning the scope and conduct of the anticipated evidentiary hearing (Dkt. 242; Dkt. 244; Dkt. 245), and defendant Frank Giacobbe subsequently filed a motion to join in those arguments (Dkt. 248).

On February 28, 2020, the government filed its response in opposition to Defendants' speedy trial motions.  (Dkt. 262).  On March 2, 2020, the government filed its response to Defendants' memoranda regarding the scope and conduct of the evidentiary hearing.  (Dkt. 264).  On March 5, 2020, defendant Robert Morgan filed a reply addressing

the scope and conduct of the evidentiary hearing (Dkt. 273), and on March 11, 2020, he filed a reply in further support of his speedy trial motion (Dkt. 279).

      H.     March 10, 2020 Status Conference

A status conference was held before the undersigned on March 10, 2020.  (Dkt. 278; Dkt. 282).  The Court confirmed that an evidentiary hearing was required to resolve the pending speedy trial motions, but limited the scope of the hearing to whether the government's electronic productions on July 31, 2019, and August 8, 2019, complied with the DPP.  (Dkt. 282 at 13).  Moreover, the Court explained that Defendants had the burden of proving by a preponderance of the evidence that the government's production did not comply with the DPP, but if they met that burden, then the government must be prepared to present evidence that any deficiencies in the production were excusable.  (*Id.* at 13-14).

Also discussed at that status conference was the government's disclosure, by letter dated February 14, 2020, that approximately 11,500 documents (16,900 documents including family members) from five devices seized during execution of the May 2018 search warrant that originally cleared the privilege screen and were produced, hit on a privilege term and should have been segregated and reviewed by the government's filter team.  (*See* Dkt. 243).  This disclosure prompted defendant Robert Morgan to file a motion for discovery (Dkt. 253; Dkt. 254), which the Court addressed at the appearance on March 10, 2020 (Dkt. 281).  As memorialized by Text Order, the Court granted the motion to the extent it sought production by the government of a Relativity history report, but otherwise denied the motion without prejudice.  (*Id.*).

Ultimately, on May 12, 2020, defendant Robert Morgan filed a motion to dismiss Counts 1, 38, 39, 61 and 62 of the Superseding Indictment with prejudice based on the government's alleged improper use of privileged communications.  (Dkt. 322; Dkt. 325). Oral argument was held before the undersigned on June 22, 2020, at which time the Court reserved decision and requested supplemental submissions from defendant Robert Morgan. (Dkt. 344).  Defendant Robert Morgan filed his supplemental submission on July 20, 2020 (Dkt. 402; Dkt. 408), and the Court requested further briefing from the government (Dkt. 434), which was filed on September 8, 2020 (Dkt. 457).

I.      Adjournment of Hearing because of COVID-19 Pandemic

Shortly after the March 10, 2020 status conference, the COVID-19 pandemic upended all aspects of life, necessitating the Court, with all parties' consent, to cancel the evidentiary hearing scheduled to commence on March 30, 2020.  (Dkt. 284; Dkt. 292). Ultimately, the Court rescheduled the evidentiary hearing to commence on July 14, 2020. (Dkt. 308).

J.      The Evidentiary Hearing

The evidentiary hearing commenced before the undersigned on July 14, 2020, continuing through the remainder of that week until July 17, 2020, and then resumed and concluded on July 22, 2020.  (Dkt. 392; Dkt. 398; Dkt. 399; Dkt. 400; Dkt. 407).

Defendant Todd Morgan presented the testimony of two employees of the vendor he retained to manage ESI in this case (D4/Special Counsel, Inc. (hereinafter "D4")): Dan Schatz and Louis Martin.  Defendant Robert Morgan presented the testimony of Robert Hyde, a senior eDiscovery specialist employed by Gibson Dunn.  Defendants also called

as a witness Craig Bowman, an employee of the United States Attorney's Office of the Western District of New York ("USAO-WDNY").   The government presented the testimony of a retained expert witness, Kenneth Marchese, senior managing consultant at IDS Discovery Solutions.

The testimony of each of these witnesses is summarized below insofar as the Court has determined the testimony is relevant to the reasoning set forth in this Decision and Order.[11]  Of course, the undersigned presided over the hearing and therefore listened to all of the testimony firsthand and in addition, in drafting this Decision and Order, has reviewed and considered all transcripts of the hearing regardless of whether summarized herein.

       1.    <u>Mr. Schatz's Testimony</u>

Mr. Schatz testified concerning various metadata deficiencies in the government's electronic discovery productions, as reflected in the exhibits introduced into evidence as Exhibit B and Exhibit C.  (Dkt. 381-1 (Ex. B); Dkt. 346-2 (Ex. C)).  The government's Initial Production[12] consisted of 1,450,837 documents, reflecting 882,841 emails and

---

[11]    The transcript of Mr. Marchese's testimony from July 16 and 17, 2020 is filed at Docket No. 401, and the transcript's pagination corresponds to CM/ECF-generated page numbers.   The remaining evidentiary hearing transcripts (including Mr. Marchese's continued testimony on July 22, 2020) are filed at Docket Nos. 409, 417, 418, 419, and 420.  The pages of those transcripts are numbered sequentially, and when referencing any portion of those transcripts herein, the Court refers to the corresponding docket number and transcript page number (<u>not</u> the CM/ECF-generated page number).

[12]    The parties have stipulated that the term "Initial Production" refers to three productions of ESI made by the government to defendant Todd Morgan prior to July 31, 2019—namely, on January 22, 2019, February 22, 2019, and July 29, 2019.  (Dkt. 436 at 1-2).

567,996 other documents.  (Dkt. 381-1 at 2-3; Dkt. 409 at 28-29).  Of those documents,

860,522 were missing DATE metadata, with over 430,000 documents reflecting no change

in the DATE metadata field formatting after the DPP was agreed-upon.  (Dkt. 381-1 at 2-3;

Dkt. 409 at 33, 56-57).  Once overlays[13] were provided by the government, the DATE

metadata field was corrected for almost one-third of the documents (primarily emails), but

590,448 documents still were missing DATE metadata, including 294,818 emails.  (Dkt.

381-1 at 2-3).  Of those 294,818 emails, 169,287 had a misformatted DATE value and

125,531 had no DATE value.  (Dkt. 420 at 713).  The Initial Production also contained

missing values for the metadata fields of FILE EXTENSION, MD5 HASH, PATH, CUSTODIAN,

MIME TYPE, and FILE SIZE—and the government overlays did not change the status of the

information in any of those fields.  (Dkt. 381-1 at 2-3).  Mr. Schatz also explained that

while he did not classify the field as missing information, some of the documents reflected

CUSTODIAN values that were "just a series of numbers and letters that had no apparent

meaning or connection to anybody."  (Dkt. 409 at 41).  It was established at the hearing

that the provision of CUSTODIAN metadata is a function of "human direction"—in other

words, it is *not* information that is extracted by a computer based on metadata imbedded

---

[13]     Overlay files were described at the hearing as "information populated into a
metadata field" which has a "matching control number or identifier" that allows one to load
the material into the eDiscovery system (such as Relativity) so that one can "populate
values that are not there" or "override values that are there."  (Dkt. 417 at 191; *see also*
Dkt. 401 at 13 ("An overlay is a limited text file.  It typically contains a Bates number or
image key for a record.  And that is used to match the following values in the database.
And when the image key is matched, the other values get overlayed into their assigned
fields.")).

within the documents but rather the values are input into the CUSTODIAN field at the direction of somebody processing the data.  (Dkt. 418 at 553).

The Laptop Production[14] initially contained 1,419,300 documents, but on March 18, 2020, the government provided an overlay file identifying 668,125 system files, so that 751,175 documents remained for analysis.  (Dkt. 346-2; Dkt. 409 at 58; *see* Dkt. 436 at 4). The extent of the missing information in the metadata fields for the Laptop Production was not as significant when compared to the Initial Production (*cf*. Dkt. 381-1 *with* Dkt. 346-2), but there was still missing information—namely, 54,578 documents were missing DATE values (although only 72 emails were missing DATE metadata), 220,996 documents were missing FILE EXTENSION values (including almost all of the emails), over 90,000 documents were missing MD5 HASH values, 164,179 documents were missing FILE SIZE values, and no CUSTODIAN information was initially provided (Dkt. 409 at 59-64; *see* Dkt. 346-2 at 2-3).

Mr. Schatz testified that D4 did not provide a log file to the government identifying missing metadata for FILE SIZE pertaining to the Initial Production (Dkt. 409 at 63), nor did it provide log files identifying missing metadata for CUSTODIAN, MIME TYPE, or absence of native files (*id*. at 74).

Mr. Schatz opined that the deficient and missing metadata issues were caused by the government's processing of the ESI.  (*Id*. at 65).

---

[14]     The parties have stipulated that the term "Laptop Production" refers to the production of ESI from three computers (Michael Tremiti's laptop, Paul White's laptop, and Kristy Trombley's desktop) on December 13 and 16, 2019.  (Dkt. 436 at 2).

2.     Mr. Martin's Testimony

Mr. Martin testified that he pulled a random sample of documents from the Relativity database that did not have any metadata, and he reprocessed the samples of native documents using three different processing software programs (Relativity, Law, and eCap), successfully extracting DATE, FILE EXTENSION, FILE SIZE, FILE NAME, MD5 HASH, and MIME TYPE metadata that was not contained in the government's productions (even after the overlay files were provided).  (Dkt. 409 at 109-21; *see* Ex. D (Dkt. 346-3)).  Mr. Martin also testified that he was able to extract metadata not provided by the government using the Nuix processing software.  (Dkt. 418 at 564-66).

The charts prepared by Mr. Martin reflected, in some instances, different values in certain metadata fields depending on the processing tool utilized.  (Dkt. 346-3).  Mr. Martin explained that different processing tools can result in different metadata values.  (Dkt. 409 at 166-67).  Mr. Martin testified that emails produced as part of the government's electronic productions were pulled from OST and PST files,[15] and it is typical to process emails out of a container file into individual emails.  (*Id*. at 149-51).  Mr. Martin also testified that when he reprocessed the data he did not reprocess the original OST or PST files, but rather the files that had been provided by the government.  (*Id*. at 151).

---

[15]     OST stands for "offline storage table" and PST stands for "personal storage table." (Dkt. 401 at 27-28).  PST and OST files were described at the evidentiary hearing as "containers of e-mails collected by individual mailboxes or servers."  (Dkt. 417 at 186). They were also referred to generically as "container files."

Mr. Martin opined that the deficient and missing metadata issues in the government's various productions were caused by the government's processing of the ESI. (*Id.* at 135-36).

### 3.   Mr. Hyde's Testimony

Mr. Hyde testified that he began processing the government's August Production[16] for loading into the Relativity database shortly after receiving the production, and he noticed a missing load file[17] whereupon he immediately notified the Gibson Dunn attorneys involved in the case.  (Dkt. 417 at 271-73).  Mr. Hyde testified that the missing load file reflected 886,507 records (or 60% of the August Production).  (*Id.* at 206).  Mr. Hyde further testified that a missing load file is not a common occurrence and that it appeared the government forgot to include it with the August Production.  (*Id.* at 208).

Like Mr. Schatz and Mr. Martin, Mr. Hyde similarly testified about various missing metadata fields from the government's productions to Gibson Dunn, and that upon reprocessing the native files produced by the government in the August Production, he was able to extract DATE values for all but 0.2% of the hundreds of thousands of emails in the August Production for which the government did not provide such values (Exhibit RM 1 (Dkt. 349-1); Dkt. 417 at 215), and FILE EXTENSION, FILE SIZE and MD5 HASH values for

---

[16]    The parties have stipulated that the "August Production" refers to the six productions of ESI by the government to defendant Robert Morgan on August 8, 2019. (Dkt. 436 at 2).

[17]    The term "load file" is used interchangeably with "DAT" file (*i.e.* a file with a .dat file extension) and has been described as "a limited text file with the metadata fields populated" that is "used to import the data into Relativity into the appropriate fields." (Dkt. 417 at 187).

all of the many documents for which such values were missing in the August Production (*see* Exhibit RM 2 (Dkt. 349-2); Exhibit RM 3 (Dkt. 349-3); Exhibit RM 5 (Dkt. 349-5); Dkt. 417 at 225-27, 234-36, 244).

Mr. Hyde testified that the deficiencies he saw with the electronic discovery were atypical, and that the issues were likely caused during processing by the government. (Dkt. 417 at 253-54). Mr. Hyde testified that the normal practice when there is an error with an ESI production is to "go back and consult with the attorneys and say, this is missing and there is an error and we'll have the individual who sent us the production to correct it." (*Id.* at 195-196).

In response to government cross-examination, Mr. Hyde admitted that much of the metadata that he was identifying at the hearing as missing or improperly formatted had never been identified for the government prior to the hearing. (*Id.* at 282, 298, 299-300, 303). Indeed, the last error log sent by Gibson Dunn to the government for the August Production was in December 2019. (*Id.* at 303-04). Mr. Hyde testified on cross-examination that the government's overlay file fixed most of the records identified by counsel from the August Production that contained misformatted DATE values, and the government provided the overlay file one week after the documents were first identified by Gibson Dunn. (*Id.* at 281-82; *see* Dkt. 444 at 18-19).

The chart introduced as Exhibit RM 1 (Dkt. 349-1) purported to depict the summary of deficiencies in the August Production with respect to the DATE metadata field, based on an analysis of the initial production, the production post-overlay, and after Mr. Hyde reprocessed the production. However, Gibson Dunn never identified any issues with

respect to missing DATE metadata, only issues where the DATE metadata field had been misformatted.  (Dkt. 417 at 280-82).  Thus, the overlays were never intended to address issues that had not been identified (such as missing DATE metadata) and yet Exhibit RM 1 suggests that the government overlay did not fix this issue.  (*See* Dkt. 349-1 at 3).  Similarly, Exhibit RM 2 (Dkt. 349-2) identifies metadata deficiencies for the August Production post-overlay, but the overlay was never intended to address missing FILE EXTENSION metadata because that issue was never identified by Gibson Dunn as a problem prior to the hearing.  (Dkt. 417 at 287).

Mr. Hyde's charts analyzing the Laptop Production included the system files even though those files had been subsequently identified by an overlay file (as acknowledged in the chart produced by D4 (*see* Dkt. 346-2 at 2)).  When testifying about Exhibit RM 2 (Dkt. 349-2), Mr. Hyde initially testified that no overlay files were provided for the Laptop Production to fix the missing FILE EXTENSION information (Dkt. 417 at 226), but he ultimately agreed in response to cross-examination by the government that, in fact, an overlay file was provided with respect to the Laptop Production that "substantially reduced the number of records where the file extension field was missing" (*id*. at 292-93).  Moreover, Mr. Hyde conceded that his analysis of the Laptop Production as reflected in Exhibit RM 2 did not take into account application of the overlay file which removed the system files.  (*Id*. at 293).

Mr. Hyde testified that it would not be typical to produce an actual PST file as the native file during electronic discovery.  (*Id*. at 284).

4.    Mr. Bowman's Testimony

Mr. Bowman testified that he processed the data from two of the seized Morgan Management servers—the Exchange and Barracuda servers—using the USAO-WDNY's processing tool (Nuix) and its default template.  (*Id.* at 326-330, 339).  Another entity— the Litigation Technology Support Center in Columbia, South Carolina ("LTSC")[18] processed some of the hard drives seized from the May 2018 search warrant using a different processing tool called Venio.  (*Id.* at 338-39; Dkt. 418 at 469).  Additionally, Mr. Bowman testified the Federal Housing Finance Agency ("FHFA") processed the Laptop Production using a "much more robust" version of Nuix[19] than the system possessed by the USAO-WDNY.  (Dkt. 417 at 339; 341-42).  Mr. Bowman never raised any concerns with LTSC that it was planning to use a processing tool different than Nuix.  (Dkt. 418 at 469-70).  Mr. Bowman never reprocessed the two servers that he had initially processed in 2018 in order to comply with the DPP, nor did he request that LTSC or FHFA reprocess any of the data.  (*Id.* at 464-65).

Mr. Bowman was the only witness who testified with any personal knowledge about the negotiations surrounding the DPP, and he could not recall any discussions during those negotiations about the processing tools that would be utilized or the type of native file that would be analyzed for purposes of creating a load file.  (*Id.* at 514-15).  Mr. Bowman

---

[18]    Mr. Bowman described LTSC as "government equipment owned, but contract run" and a "vendor-type operation."  (Dkt. 417 at 338).

[19]    Mr. Bowman clarified that "more robust" meant able to extract data from the source material faster, not able to extract more data.  (Dkt. 417 at 342).

explained that a file extension would not be provided for an email extracted from a container file, even if it was produced in a derivative native format with a file extension, because the load file was created from the native as it existed in the container file, not the native that was ultimately provided to the defense.  (*Id*. at 513).

Mr. Bowman testified that the date field requested by the defense and included in the DPP was "unusual" because it was limited to "date sent," (Dkt. 417 at 346), although the template document used by the parties to draft the DPP was the SEC's Data Delivery Standards and it appears that the government proposed the initial protocol with the date sent field.  (*See* Dkt. 418 at 452-56, 459-62; Exhibit O; Exhibit Q).

Mr. Bowman testified that the government did not produce the original native container files, but instead "created" files from records extracted from those container files and produced those "created" files as "natives."  (Dkt. 418 at 513-14).  However, the metadata provided to Defendants was extracted from the original native container files, not from the native files that were created and produced to Defendants.  (*Id*. at 545-47).

Mr. Bowman testified that he was instructed by "the AUSAs" to leave the CUSTODIAN metadata field "blank" for the Laptop Production and instead provide a unique "Q value" in the PATH metadata field which identified "where the laptops came from."  (*Id*. at 552-53).  The government overlay produced on January 29, 2020, provided the missing CUSTODIAN information for the Laptop Production.  (Dkt. 436 at 4; Dkt. 346-2).[20]

---

[20]     The evidentiary hearing established that of the 90,895 documents in the Laptop Production that did not contain MD5 Hash values, the government's overlay file produced on January 6, 2020, provided the missing information for 52 of those documents.  (Dkt. 346-2 at 2-3; Dkt. 436 at 3-4).  Mr. Bowman explained that the MD5 Hash values for those

The DPP required that DATE metadata be provided in the format "mm/dd/yyyy hh:mm AM/PM" and provided an example of DATE metadata in Addendum A: "10/12/2010 07:05 PM." (Ex. A (Dkt. 27-1 at 3-4)). Mr. Bowman testified as follows in response to questions by the Court as to why certain DATE values did not conform to the DPP:

> Q      Why was the initial file, why did that not contain the date format as provided in the document production protocol?
>
> A      To be honest, my team missed it when we were looking at it. We didn't realize, because a million plus records, it was near the bottom, we didn't see it.
>
> Q      When you say didn't see it. You missed it. Where in the process did you miss it?
>
> A      What happened in the initial processing that was done before there was a document protocol, that one field that got loaded, had the long file date in it. Normally we produce with a different field. But instead they produced the one with the long file in it.
>
> Q      Was that something because of a setting in Nuix that you had?
>
> A      Yes.
>
> Q      And once the document protocol was entered into, and I'm assuming you reproduced the previous productions using the document protocol.
>
> A      Yes. But, unfortunately, that was missed, because we gave the production came up from the LTSC and then we gave them the production. Unfortunately, during the quality control check, that was missed and those files were produced with the long file date. They should have been produced with the smaller date, which we fixed.

---

52 documents were not provided initially because the FHFA had the Nuix settings at the "lower industry standards" so that files of a certain size did not have MD5 Hash values. (Dkt. 418 at 534).

(Dkt. 418 at 534-35).

     5.    Mr. Marchese's Testimony

Mr. Marchese was retained by the government to provide an opinion concerning its compliance with the DPP. Mr. Marchese testified that in order to analyze the productions, he loaded the DAT files from both the Initial/August Productions and the Laptop Production into Sequel, which he described as "the back end database that is used behind Relativity." (Dkt. 401 at 21). According to Mr. Marchese, this was necessary to make any meaningful findings about whether the government productions complied with the DPP. (*Id*. at 22).

Mr. Marchese testified that different processing tools can produce different results from the processing of ESI. (*Id*. at 14, 67-68; *see* Dkt. 420 at 687-88 (agreeing that if a processing tool different than Nuix is used, it might "scrape" different information)). When parties are negotiating a DPP, he testified that they should understand what processing tool is going to be used to create the metadata fields. (Dkt. 401 at 68).

Mr. Marchese testified that it has been the "custom in electronic discovery for the last couple of decades" to produce files extracted off of OSTs and PSTs. (*Id*. at 106). In other words, by convention in electronic discovery, emails that are contained in an OST or PST file are broken into singular units and turned into files with an extension of .msg ("MSG") or .eml ("EML"). (*Id*. at 28-29).

Mr. Marchese testified that simply identifying missing metadata fields from a production is not enlightening without understanding why values in the particular metadata field are absent. (*Id*. at 25-26). Mr. Marchese explained that where Defendants reprocessed

the ESI and extracted metadata that was not previously produced, they were using "their processing tool on a different set of information than the government did"—namely the EMLs that were provided, not the original source OST and PST files from which the EMLs were derived.  (*Id.* at 53, 56; *see also id.* at 57 ("[T]he EML files, of course they have file extension and size, they were created by the tool.  But natively that information doesn't exist and could not be extracted by Nuix."); *id.* at 60 ("For every tool he used, he reprocessed the items we exported, not the same original source content.  So to imply that that somehow found values that the government failed to find, I think, is not correct."); *id.* at 108 (it is "misleading to imply to the Court that reprocessing a different source material . . . somehow proves that the government didn't pull something out that it should have")).  For instance, the FILE EXTENSION metadata field would not be included within these records because file extensions for each file do not exist in the native content (*i.e.* in the OST or PST file).  (*Id.* at 32).  "The Nuix tool extracts it prior to the new MSG or EML files being created."  (*Id.*).

Mr. Marchese testified that with respect to files identified by Defendants as missing metadata pertaining to FILE SIZE, FILE TEXT, and MD5 HASH, this was because the files were "compound files that were not readily processable by the eDiscovery processing tool."  (*Id.* at 37).  As a result, he concluded that the government's production complied with the DPP.  (*Id.* at 38, 49, 50).  Moreover, he disagreed that the absence of this metadata impacted the usability of the production.  (*See*, *e.g.*, Dkt. 420 at 688-89 (testifying that a user could filter and sort by file extension through Relativity by utilizing the information in the link field that included the full path to the near native document)).

Mr. Marchese testified that the CUSTODIAN metadata field is filled based on information collected and inputted by a human.  (Dkt. 401 at 112).

Mr. Marchese testified that the emails identified by Defendants as containing missing DATE metadata nearly all came from a large OST file.  (*Id*. at 27).  Mr. Marchese initially testified that the government complied with the DPP as it related to the DATE metadata field because "the messages that lacked that value were not sent by the owner of that OST on that computer."  (*Id*. at 35, 39, 61-63).  Mr. Marchese testified that he reviewed the native files of the emails at issue and he determined that they did not have values that Defendants claimed were missing.  (*Id*. at 36; *see id*. at 39 ("you can't claim something was sent when it wasn't sent on that computer by that user")).  Mr. Marchese explained:

> But 'date sent' is a specific date field.  If you don't send an email, it doesn't get populated.  If you just receive an email in your mail archive, even though it was received by somebody at some point in its life, and there is information about that being sent in the header and other fields, it doesn't have a date sent value.

(*Id*. at 61-62).

Mr. Marchese later qualified his testimony once the defense disclosed its intention to present rebuttal evidence showing that DATE metadata *was* provided for emails even where the custodian or owner of the OST file was *not* the sender of the email.  Mr. Marchese described a variety of additional factors that could impact the extraction of DATE metadata for emails.  (Dkt. 420 at 638-44; *see id*. at 639 ("There are a myriad of factors that influence what date properties are in these records and what did can be extracted from them.  And this exhibit helped me learn about another one.")).  However, according to Mr. Marchese, the "processing tool can only extract what is in the files," and he opined that in

this case, the processing tool extracted what it could, consistent with the DPP. (*Id*. at 644-45). Mr. Marchese testified that this did not change his testimony about the root cause of the missing values. (*Id*. at 644; *see id*. at 645 (testifying that the processing tool could not "extract what it didn't understand to be a correct date sent.")). Mr. Marchese also opined that if a "sort date" metadata field had been utilized instead of the "date sent" field that Defendants wanted included in the DPP, the DATE metadata field would have been populated for the vast majority of records. (*Id*. at 646-48).

Mr. Marchese explained that he did not study the records reflected in the exhibit prepared by the defense for rebuttal (Exhibit R) prior to initially testifying because the records had not been identified by the defense as having problems. (*Id*. at 631). Defendant Todd Morgan contends in his post-hearing memorandum that Mr. Marchese's attempt to qualify his testimony concerning the rebuttal proof is contradicted by reference in his report to one of the emails contained in Exhibit R. (*Id*. at 669-70; *see* Dkt. 435 at 31). However, the copy of the email reprinted in Mr. Marchese's report was identified as coming from Kevin Morgan's computer, and it did *not* contain any value in the DATE field. (Dkt. 420 at 701-02, 711). In other words, reviewing that particular email would not have alerted Mr. Marchese to the information revealed by the defense rebuttal proof that, in some instances, metadata for DATE *was* provided even where the custodian was not the sender of the email.

6.   <u>Defendant Todd Morgan's Rebuttal Proof</u>

Rebuttal proof was presented establishing that the same email was produced in four different ways by the government. (*See* Dkt. 435 at 30; Exhibit R). Mr. Schatz testified

on rebuttal that 142,458 emails were contained in the Laptop Production.  (Dkt. 420 at 692-93).  Of those, all but 72 were produced by the government with a date in the DATE metadata field.  (*Id*. at 693).  Moreover, 140,065 of the emails were extracted from OSTs belonging to the three custodians of the computers that comprised the Laptop Production.  (*Id*. at 693-94).  Of those, 86,735  were received and not sent by the custodians and yet, in all instances, the DATE metadata field was provided.  (*Id*. at 694-95).

The rebuttal proof thus established that DATE metadata was provided for emails that were not sent by the owner of the OST on a particular computer, but it did *not* establish that the government failed to provide DATE metadata for emails where the custodian or owner of the OST file *was* the actual sender of the email.

K.     Post-Hearing Proceedings

Defendant Todd Morgan submitted his post-hearing brief on August 13, 2020 (Dkt. 435), and defendants Robert Morgan and Michael Tremiti submitted their respective post-hearing briefs on August 14, 2020 (Dkt. 437; Dkt. 438).  The government submitted its post-hearing brief on August 28, 2020 (Dkt. 444), and defendants Robert Morgan, Todd Morgan, and Michael Tremiti submitted reply briefs on September 2 and 3, 2020 (Dkt. 449; Dkt. 452; Dkt. 454).  On September 8, 2020, defendant Frank Giacobbe filed a motion to join in the other defendants' arguments.  (Dkt. 455).

On August 31, 2020, defendant Robert Morgan filed a motion to compel seeking the dates on which the materials included in the government's June 25, 2020 production were produced to the government by third parties, and copies of the requested grand jury subpoenas.  (Dkt. 439; Dkt. 442).  Specifically, defendant Robert Morgan contends that

this recent production may constitute an untimely production of Rule 16 material, which would further support dismissal of the Superseding Indictment with prejudice.  (Dkt. 439-1 at 4 ).

The government filed a response in opposition on September 4, 2020 (Dkt. 453), and defendant Robert Morgan filed a reply on September 8, 2020 (Dkt. 456).  The record establishes that the materials at issue with this motion to compel relate to approximately 38,000 pages of materials produced as Rule 16 discovery material by the government in June 2020, some of which were obtained in 2020 in response to grand jury subpoenas issued in November 2019.  (Dkt. 439-1 at 4; Dkt. 439-4-; Dkt. 453 at 4; Dkt. 456 at 6).  In other words, the documents at issue were obtained by the government after the July 31, 2019 deadline set by the Magistrate Judge, and therefore relate to the government's continuing discovery obligations—not its obligation to produce discovery by the July 31, 2019 deadline.

Oral argument with respect to both the speedy trial motions and the motion to compel were held before the undersigned on September 10, 2020, at which time the Court reserved decision.  (Dkt. 458).

## II.   <u>ANALYSIS</u>

As discussed further below, the Court concludes that the statutory speedy trial clock has expired, necessitating dismissal of the Superseding Indictment.  However, the Court further concludes that the dismissal should be without prejudice, and that Defendants' constitutional rights to a speedy trial have not been violated.  Because Defendants' speedy trial arguments are necessarily tied to the status of voluntary discovery, the Court first addresses its findings with respect to the government's compliance with its obligations under Rule 16 to provide voluntary discovery, before turning to whether Defendants' statutory or constitutional speedy trial rights have been violated.

### A.   <u>Findings of Fact with Respect to Voluntary Discovery</u>

Defendants have established that the government failed to produce all Rule 16 discovery in its possession at the time of the May 29, 2019 status conference, by the deadline of July 31, 2019.  However, the Court disagrees that the government's errors—particularly with respect to electronic discovery and its compliance with the DPP—are as egregious as claimed by Defendants.  While some of the errors in the electronic discovery were due to the government's processing of the ESI (and failure to adequately reprocess it after the DPP was agreed upon), the Court also concludes that Defendants and the government were not always communicating effectively regarding electronic discovery.

Issues surrounding electronic discovery are complicated—and they become even more complicated when dealing with the volume of information at issue in this case.  There is no question that the government's conduct was, at times, sloppy and inconsistent, and this led to various problems with the discovery.  On the other hand, while it is not

Defendants' burden to ensure the government's compliance with its Rule 16 obligations, any electronic discovery production of this nature necessarily requires parties to work together (with the assistance of IT personnel) to sort through issues in the production. While the Magistrate Judge's imposition of a "club" at the May 29, 2019 status conference was intended to promote the government's compliance with its Rule 16 obligations, it ultimately had the effect of incentivizing Defendants to establish the government's noncompliance with its discovery obligations (as opposed to motivating the parties to work together to resolve any electronic discovery issues). Thus, while the impetus for the "club" was plainly driven by the historical failures of the government to meet the deadlines set by the Magistrate Judge, instead of rectifying those problems it ultimately spurned extensive litigation on whether the government had failed to comply with the July 31, 2019 deadline.

To be clear, the Court does not believe the record supports a finding that any party acted in bad faith. Rather, the discovery in this case was significant, and the government failed to effectively manage that discovery. In the end, because of its own negligence, the government did not meet the discovery deadline set by the Magistrate Judge.

### 1.    The Laptop Production and Todd Morgan iPhone

In November 2019, the government disclosed that it had missed three devices seized as part of the May 2018 search warrant, and accordingly never processed those devices for production. Despite agreeing that it would report back concerning the extent of ESI contained on the devices that had not been previously produced as part of discovery, the government still has failed to do so—representing during the oral argument on September 10, 2020, that it was still attempting to ascertain that information. At that same oral

argument, defense counsel suggested that over 600,000 documents were produced as part of Rule 16 discovery in the Laptop Production that had not been previously produced, and the government conceded it had no information to dispute that figure. Thus, there is no question that the government failed to produce a significant amount of Rule 16 discovery contained within these three devices by the deadline of July 31, 2019.

There is also no dispute that the government failed to produce Rule 16 discovery contained in another device seized during the May 2018 search warrant execution—Todd Morgan's iPhone. This was another device that was missed by the government. The government still has failed to produce Rule 16 discovery from this device, although the current delay relates to privilege issues surrounding the device and a privilege review by defense counsel. Nonetheless, by the July 31, 2019 deadline, the government failed to produce Rule 16 discovery contained on this iPhone and, in fact, had not even processed the device for privilege review.

Accordingly, the record is clear that of the eight computers seized pursuant to the May 2018 search warrant, the government failed to provide Rule 16 discovery for three of those devices by the July 31, 2019 deadline. Similarly the government failed to provide (and still has failed to provide) Rule 16 discovery for defendant Todd Morgan's iPhone[21] seized pursuant to the May 2018 search warrant.[22]

---

[21]   The government also seized an iPhone from defendant Robert Morgan but that has not been processed because the government has been unable to crack the passcode. (*See* Dkt. 274 at 2-3).

[22]   Notwithstanding the government's attempts to argue otherwise, the Court does not view as relevant for purposes of this Decision and Order the fact that the government

2.   Findings About Electronic Discovery Based on the Evidentiary Hearing

a.   *Scope of Hearing and Burdens*

Federal Rule of Criminal Procedure 12(d) provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  To aid it in making such factual findings, the Court has discretion to order an evidentiary hearing.  *See United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016); *United States v. Bout,* 666 F. App'x 34, 36 (2d Cir. 2016); *United States v. Solnin*, 81 F. Supp. 3d 193, 204 (E.D.N.Y. 2015).  An evidentiary hearing is appropriate where there are factual issues that cannot be ascertained from the written record.  *See United States v. Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993); *see also Bout*, 666 F. App'x at 39 (affirming denial of request for evidentiary hearing where it was "unnecessary to develop the record").  Here, in order to resolve Defendants' speedy trial motions, the Court concluded that an

---

ultimately returned some of the devices to their owners.  According to the government, the actual laptops and desktops were returned to Morgan Management on May 17, 2018—days after execution of the search warrants and at a time when defendant Robert Morgan allegedly still owned the company—and Todd Morgan's iPhone was returned to his counsel on October 16, 2018.  (Dkt. 262-1 at 4 n. 3).  Returning devices that have been seized as part of the normal processing of search warrant material does not comply with the government's obligations under Rule 16.  In fact, some of the defendants were not even parties at the time the items were seized and then returned.

Similarly, the Court acknowledges that on February 10, 2020, the government produced mirror images of the laptops and desktops seized pursuant to the May 2018 search warrant, as well as a copy of the extracted files for the iPhone associated with defendant Todd Morgan.  (*Id*. at ¶ 16).  On February 19, 2020, the government produced mirror images of data seized from Morgan Management servers pursuant to the May 2018 search warrant.  (*Id*. at ¶ 17).  However, February 2020 was long past the July 31, 2019 voluntary discovery deadline, and the government has conceded at various times that producing mirror images does not constitute compliance with Rule 16 and the DPP.

evidentiary hearing was needed to resolve factual disputes concerning whether the government's electronic productions complied with the DPP.

With respect to the standard of proof at the hearing, the Court agreed with the parties that the preponderance of the evidence standard applied.  (*See* Dkt. 242 at 4; Dkt. 244 at 7-8; Dkt. 245 at 2; Dkt. 264 at 2 n. 1); *see also United States v. Chimurenga*, 760 F.2d 400, 406 (2d Cir. 1985) ("Proof by a preponderance of the evidence is the standard usually used in pretrial proceedings."); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 579 (E.D.N.Y. 1995) ("In criminal *pretrial* proceedings, unless Congress provides to the contrary, proof by a preponderance of the evidence is the standard usually used." (quotation omitted)).

With respect to the burden of proof at the hearing, the plain language of the Speedy Trial Act provides that "[i]f a defendant is not brought to trial within the time limit required by [the Act] . . ., the information or indictment shall be dismissed on motion of the defendant.  *The defendant shall have the burden of proof of supporting such motion* . . . ." 18 U.S.C. § 3162(a)(2) (emphasis added).[23]  Relatedly, the general rule is that a defendant alleging a Rule 16 violation bears the burden of demonstrating that such a violation has occurred.  *See, e.g., United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993); *United*

---

[23]    The only identified exception to this rule is for exclusions of time under 18 U.S.C. § 3161(h)(3) (delay resulting from the absence or unavailability of the defendant or an essential witness), for which "the Government shall have the burden of going forward with the evidence . . . ."  *Id.* § 3162(a)(2).  In other words, the Speedy Trial Act itself squarely places the burden of demonstrating a violation on Defendants, subject to one exception not relevant here.

*States v. Maniktala,* 934 F.2d 25, 28 (2d Cir. 1991); *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013).[24]   However, even the government acknowledged that if Defendants established a violation of the Speedy Trial Act, it would need to come forward with evidence demonstrating the reason for any delay.  (Dkt. 264 at 2 (citing *United States v. Caparella*, 716 F.2d 976, 980 (2d Cir. 1983)).

### b.   Findings of Fact

The Court states up front that, despite each party's claims about the credibility of the other party's witnesses, the Court does not find that any of the witnesses were intentionally testifying falsely.  Rather, electronic discovery is a complicated and very technical subject.  As a result, facts can be easily spun in a light most favorable to one party's position or the other.  That occurred here on behalf of all parties.  Nonetheless, the Court does not conclude that any of the witnesses were not credible.  Moreover, based on the Court's careful review of the record, it reaches the conclusions as set forth below.

---

[24]     The Court was not persuaded by Defendants' arguments that they had presented sufficient evidence of a violation in advance of the hearing so as to shift the burden to the government.  Defendants relied on the "[t]he ordinary rule, based on considerations of fairness," that the law "does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *United States v. N.Y, New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n.5 (1957).  However, that common law rule does not apply where, as here, Congress has expressly allocated the burden of proof in a contrary fashion.  Further, there is nothing in the language of the Speedy Trial Act to support the notion that once a defendant makes a preliminary showing, the burden shifts to the government to establish that the clock has not expired.  "Where Congress intends a statute to allocate the burden of proof to different parties on different issues, it does so expressly." *United States v. Technodyne LLC*, 753 F.3d 368, 380-81 (2d Cir. 2014).  Indeed, Congress did so with the Speedy Trial Act, carving out from the general rule that the defendant bears the burden of proof exclusions of time under § 3161(h)(3).   If Congress had wanted to create further nuances in the allocation of the burden of proof, it would have done so.

First, the government's Initial/August Productions of electronic discovery contained misformatted DATE metadata information that did not comply with the requirements of the DPP.  The misformatted DATE metadata was caused by Mr. Bowman and his team failing to catch the errors while conducting quality review.  The misformatting occurred during the initial processing of the ESI prior to the  DPP being entered into, and if the government had reprocessed the ESI after the DPP was agreed upon, these errors could have been avoided.  Instead, the government did not reprocess the ESI, and the quality review conducted by the government was insufficient to catch these errors.

Second, the absence of metadata for many of the fields in the Initial/August Production was the result of metadata being pulled from OST and PST container files.  In other words, the metadata did not exist in the native files and therefore the processing software was unable to extract metadata that did not exist.  This was the case with respect to various metadata fields, including for example FILE EXTENSION.  The government did not violate the DPP by failing to provide this metadata.  Moreover, Defendants' reprocessing of the files failed to establish that metadata existed that was not provided by the government, because Defendants were not processing the same material as processed by the government.  For instance, Defendants reprocessed EML files that were pulled and created from the PST or OST files, and thus they pulled metadata from the EML files, but the government applied its processing software to the PST or OST files. As a result, the absence of metadata in this regard does not establish an error on the part of the government or violation of the DPP.

Third, although the DPP required the production by the government of native files, defined as "the format in which they are ordinarily used and maintained during the normal course of business," (Dkt. 27-1 at 2), the Court concludes that the government's production of the near native or derivative native files from the OST or PST files did not violate the DPP because this is standard practice in the eDiscovery field.  In fact, the Court concludes that if the government had produced the OST or PST files as the native files—as opposed to converting the emails into single files with an .eml or .msg extension—this would have likely prompted even more complaints from Defendants.

Fourth, the fact that the government was producing near native and derivative native files from the container files, without producing metadata for the near natives or derivative natives, led to a significant amount of confusion with respect to the production.  All parties bear some responsibility for that confusion and the inability to effectively communicate through their respective IT specialists about those issues.  It ultimately took many status conferences and a week-long evidentiary hearing to establish that the differences resulting from processing true natives as opposed to near natives or derivative natives accounted for many of the discrepancies identified by Defendants.  There are certain inconsistencies to the government's approach here—it produced near native or derivative native files, but then did not correspondingly provide metadata for those files.  Nonetheless, the Court concludes that the government proceeding in this manner did not constitute a technical violation of the DPP.  Indeed, the only evidence in the record about discussions during the negotiation of the DPP suggests that nothing was discussed about this issue.

Fifth, the absence of DATE metadata (missing metadata, not misformatted) from the Initial/August Production was likely caused by a variety of factors, including the fact that during the processing of this production the software was directed to "scrape" only very specific information with respect to "date sent."  The Court agrees that the DPP did not specify the processing software that was to be used, and the Court also credits Mr. Marchese's and Mr. Bowman's testimony that a more expansive DATE field (such as "sort date") could have pulled more information.  However, it is also apparent that the Laptop Production pulled far more DATE metadata than was provided for the Initial/August Production.  In other words, allegedly using the same process and same tools, the Laptop Production resulted in DATE metadata for almost all of the emails produced, but metadata like this was missing from the Initial/August Production.  This suggests that FHFA's processing of the ESI for the Laptop Production in December 2019 was handled differently than the earlier processing by differing agencies.  There is no reason to believe that the factors that Mr. Marchese testified to as influencing the production of DATE metadata would have influenced the Initial/August Productions any differently than the Laptop Production.  Thus, the Court concludes that Defendants established that the extent of missing DATE metadata for the Initial/August Production was likely the result of the processing of the data, and constituted a violation of the DPP by the government

Sixth, the Court does not find that defendant Robert Morgan established that the missing load file with the government's August Production was the result of government error.  Although Mr. Hyde testified generally that one of the first steps after receiving an ESI production from a third party is to examine the load file and that he noticed the missing

load file when he loaded the data into the Relativity database (Dkt. 417 at 187-88, 271), no evidence was offered by defendant Robert Morgan at the hearing as to the specific mechanics of how the discovery of the load file occurred, no other defendant experienced a similar issue, and the government has credibly represented that its copy of the production contained the load file  (*see* Dkt. 143-1 at ¶ 10).  Moreover, even if the load file was missing because of an error by the government, the Court is not persuaded that it would be appropriate to consider in connection with the pending motions.   Mr. Hyde testified that he noticed the missing load file when he was loading the data into the Relativity database, that he began processing the ESI for loading when it was received in August 2019, and that he immediately notified attorneys at Gibson Dunn of the missing load file.  (*Id.* at 271-73).  Yet, counsel for defendant Robert Morgan never followed up with the government concerning the missing load file until October 30, 2019—*i.e.* outside the speedy trial clock window of 70 days if it began to run on August 1, 2019.  (Dkt. 262-1 at ¶ 52).

Seventh, any errors with respect to CUSTODIAN metadata were the result of human error on the part of the government.  Moreover, the government prosecutors expressly instructed Mr. Bowman not to produce CUSTODIAN information for the Laptop Production, even though the government had provided similar information previously.  Failing to provide the CUSTODIAN information violated the DPP.

In sum, the Court believes that it would have been much more prudent if the government, after reaching agreement with the defense about the DPP, had utilized a competent vendor to process the ESI (and all the previously produced ESI) in the same manner with the same settings and utilizing the same tools.  That did not occur here, which

led to electronic productions being produced in an inconsistent manner and, in some instances, in violation of the DPP. Although the government contends that there was no need to reprocess the data because any errors could be addressed through an overlay file (Dkt. 444 at 40-41), that approach shifts the burden to Defendants to identify errors in the productions. By not reprocessing the data after the DPP was entered into—and by allowing three different agencies to process the data using different processing tools—the government created a situation where there were errors and inconsistencies in its productions that were only addressed if identified by Defendants. Although the Court agrees, as Defendants' own witnesses testified, that electronic discovery necessarily involves back-and-forth between parties so as to ensure the adequacy of any electronic production, the government's approach necessarily led to its failure to produce electronic discovery in accordance with the DPP, by the deadline of July 31, 2019. The errors were not as egregious as claimed by Defendants, and as noted above, the Court does not agree with Defendants as to all their contentions concerning problems with the electronic productions—but nonetheless, there were errors and a lack of compliance with the DPP.

### 3. Other Discovery Issues

Defendants have also identified a host of other discovery issues. For instance, Defendants cite to the failure of the government to produce the contents of the Larry Hill server as a violation of Rule 16 supporting a dismissal on speedy trial grounds. (*See, e.g.,* Dkt. 435 at 38). However, that server was not in possession of the government at the time of the May 29, 2019 status conference—or even by the July 31, 2019 deadline—and the Magistrate Judge's speedy trial order made it clear that the condition imposed applied to

discovery in the government's current possession, not its continuing discovery obligations. Similarly, with respect to defendant Robert Morgan's pending motion to compel addressed to additional material produced by the government in June 2020, again, this information pertained to the government's continuing discovery obligations—it did not represent material in its possession on July 31, 2019. To the extent Defendants argue that these examples represent a manifestation of the government's continuing discovery failures, necessitating a dismissal with prejudice, the Court addresses that argument further below.

Defendants also contend that the government applied inadequate search terms to the electronic discovery it produced, insufficient to satisfy Rule 16. (Dkt. 217 at 13-14). Even if true, the record does not support the notion there was ever any discussion about the scope of the search terms being applied to the seized electronic devices in order to comply with Rule 16. Again, the Court will address this issue further in connection with its analysis of whether the dismissal should be with or without prejudice.

Finally, as noted above, a motion is pending related to the government's alleged failure to segregate privileged information appropriately, resulting in certain allegedly privileged information being presented to the grand jury. Again, this issue will be addressed in connection with the Court's analysis of whether the dismissal should be with or without prejudice, but it does not affect the Court's analysis of whether the speedy trial clock has expired.

B.     More Than 70 Days Have Elapsed from the Speedy Trial Clock

1.     The Speedy Trial Act

The Speedy Trial Act, 18 U.S.C. § 3161 *et seq*., requires that a criminal defendant's trial commence within 70 days of a defendant's initial appearance or indictment, but excludes from the 70-day period days lost due to certain types of delay.  Section 3161(h) of the Act specifies the types of delays that are excludable from the calculation, some of which are automatically excludable but others of which are excludable only if a court makes certain findings enumerated in the statute.  *See Bloate v. United States*, 559 U.S. 196, 203 (2010).  The time needed for the government to produce voluntary discovery and for the defense to prepare pretrial motions is not automatically excluded from the speedy trial clock, and therefore to stop the speedy trial clock an exclusion in the interest of justice must be granted pursuant to 18 U.S.C. § 3161(h)(7).

The Supreme Court has recognized the need for "procedural strictness" in granting an exclusion pursuant to § 3161(h)(7):

> The exclusion of delay resulting from an ends-of-justice continuance is the most open-ended type of exclusion recognized under the Act and, in allowing district courts to grant such continuances, Congress clearly meant to give district judges a measure of flexibility in accommodating unusual, complex, and difficult cases.  But it is equally clear that Congress, knowing that the many sound grounds for granting ends-of-justice continuances could not be rigidly structured, saw a danger that such continuances could get out of hand and subvert the Act's detailed scheme.  The strategy of § 3161(h)[7] . . . then, is to counteract substantive openendedness with procedural strictness.  This provision demands on-the-record findings and specifies in some detail certain factors that a judge must consider in making those findings.

*Zedner v. United States*, 547 U.S. 489, 508-09 (2006).  The failure to comply with those requirements cannot be fixed after the fact—in other words, a court may not retroactively

determine that the ends of justice support an exclusion of time.  *United States v. Tunnessen*, 763 F.2d 74, 77 (2d Cir. 1985).  Importantly, "[i]t is well established that a criminal defendant has 'no obligation to take affirmative steps to insure that [he will] be tried in a timely manner.'  It is the court and the government that bear the affirmative obligation of insuring the speedy prosecution of criminal charges."  *United States v. Bert*, 814 F.3d 70, 82 (2d Cir. 2016) (internal citation omitted).  As such, a criminal defendant has no responsibility for keeping track of the clock—that burden falls to the government and the court.

### 2.  The Magistrate Judge's Interest of Justice Exclusion

The Magistrate Judge raised speedy trial concerns almost from the outset of the case, related to the government's failure to provide voluntary discovery in accordance with the deadlines he set.  At the October 31, 2018 status conference, he expressly contemplated employing a "club" whereby the speedy trial clock would run until the government produced voluntary discovery.  And once the Superseding Indictment was returned, he imposed that "club"—conditioning his interest of justice exclusion on the government complying with the deadline  he set for the production of voluntary discovery (*i.e.* July 31, 2019).

Because a further status conference was not scheduled by the Magistrate Judge—in fact, he expressly indicated his aversion to proceeding in a "piecemeal" fashion with various status conferences as had occurred after return of the initial Indictment—there was no set mechanism by which it could be confirmed on the record during the time prior to expiration of the speedy trial clock that, in fact, the government complied with its discovery

obligations and the clock was stopped.  And the record is clear that concerns about the adequacy of the discovery provided by the government were never raised by Defendants until more than 70 days after the July 31, 2019 deadline.  But Defendants are not the keepers of the clock and they do not bear the responsibility for bringing themselves to trial in a timely manner—it is the court and the government who must keep track of the clock. During the 70-day time period after the deadline for production of voluntary discovery, the government never took any steps to confirm on the record that it had complied with the Magistrate Judge's deadline and that the clock was stopped.

The Court acknowledges that there is some ambiguity with respect to the Magistrate Judge's speedy trial order.  The May 29, 2019 written Scheduling Order confirmed that time had been excluded from the speedy trial clock from May 29, 2019, through January 31, 2020, "for the reasons stated on the record herein," and while it contained the July 31, 2019 deadline for voluntary discovery production, it made no reference to that condition being imposed with respect to the interest of justice exclusion.  Similarly, when initially discussing the exclusion of time, the Magistrate Judge indicated that he was "contemplating" imposing a condition linking the stopping of the clock to the production of voluntary discovery, but when ultimately granting a speedy trial exclusion during the May 29, 2019 status conference, the Magistrate Judge expressly excluded the time through January 31, 2020, with no reference to the condition of compliance with the July 31, 2019 discovery deadline.

However, that language must be read in the context of the entire discussion at the status conference—and indeed, in the context of the history of the government's missed

- 52 -

deadlines—and the Magistrate Judge plainly intended to impose a "club" that if the government failed to comply with the July 31, 2019 voluntary discovery deadline, the clock would start to run. Moreover, when engaging in the colloquy with both counsel for Todd Morgan and the government about the speedy trial exclusion, there was express reference to the condition that discovery be produced by July 31, 2019. Thus, this Court concludes that the effect of the Magistrate Judge's order was that the failure to provide voluntary discovery by July 31, 2019 would start the running of the clock. In other words, the Magistrate Judge's interest of justice exclusion on May 29, 2019, was conditioned on the government producing the voluntary discovery in its possession by July 31, 2019.

The government contends that a conditional interest of justice exclusion based on Rule 16 compliance cannot withstand legal scrutiny. (*See*, *e.g.*, Dkt. 262 at 2). The government's after-the-fact attempt to attack the Magistrate Judge's speedy trial exclusion is wholly without merit. First, the government voiced no objection to the imposition of this condition at the status conference on May 29, 2019, and in fact agreed that such a requirement "makes sense." Second, any interest of justice exclusion is subject to procedural strictness, and thus, to the extent the Magistrate Judge's condition suffered from any legal infirmity, then the entire interest of justice exclusion would be ineffective. In other words, one cannot retroactively attempt to fix any procedural irregularity with respect to the interest of justice exclusion. Third, it was well within the Magistrate Judge's discretion to grant—or not grant—an interest of justice exclusion. Nothing required that he grant the exclusion and stop the clock. Because he elected to grant the exclusion only conditioned on the government complying with the deadline set for discovery, then that

requirement had to be met—if not, as the Magistrate Judge explained, the clock would start to run.

Having concluded that the interest of justice exclusion depended on the government's production of voluntary discovery by July 31, 2019, the Court turns to whether the government complied with that requirement—and there is no dispute that it did not. The government failed to produce ESI from three of the eight computers seized during execution of the May 2018 search warrant, and this failure resulted in hundreds of thousands of electronic documents not being provided to Defendants by the deadline of July 31, 2019. Further, the government failed to process Todd Morgan's iPhone so that the information could undergo a privilege review and ultimately be turned over to Defendants. Plainly, these failures by the government violated the Magistrate Judge's requirement that voluntary discovery within the government's possession as of May 29, 2019, be produced by July 31, 2019. Thus, the speedy trial clock began running as of August 1, 2019, and it did not stop until November 15, 2019, when defendant Robert Morgan filed a motion for an extension of time to file pretrial motions.[25] (Dkt. 138). This

_____

[25]     With respect to the length of the delay, Defendants contend that at least 106 unexcluded days have elapsed between August 1, 2019 and November 15, 2019. (Dkt. 217 at 22; *see id.* at 29; Dkt. 435 at 38). The Court agrees that 106 unexcluded days is the correct calculation—in other words, 36 days in excess of the 70-day speedy trial clock, meaning that the speedy trial clock expired on October 9, 2019.

Defendant Michael Tremiti takes the position that because the government has still allegedly not complied with its Rule 16 discovery obligations, the speedy trial clock continues to run (Dkt. 234 at 4) and defendant Todd Morgan argues that because the government did not reprocess the ESI after entry of the DPP, the continuance entered on May 29, 2019, was necessitated by lack of diligent preparation on the part of the government, and therefore the clock started running as of May 29, 2019 (Dkt. 435 at 38-39). The Court disagrees with both assessments. The clock was plainly stopped until

means that 106 days ran on the speedy trial clock, representing 36 days more than the 70 days allowed under the statute.

As referenced above, the Court has also concluded that certain aspects of the government's electronic discovery failed to comply with the DPP, although the Court is not as convinced that these failures would have necessitated a running of the clock as of August 1, 2019, based on the terms of the Magistrate Judge's exclusion order. The Magistrate Judge's frustration with the government's discovery conduct was plainly directed at its missed deadlines for production of discovery, as opposed to any technical issues related to that discovery. Moreover, at the appearance on May 29, 2019, counsel for Todd Morgan expressly represented that the electronic discovery had been produced in the

---

August 1, 2019, to allow time for the government to produce discovery related to the additional charges in the Superseding Indictment that had not been previously produced. In other words, the factual predicate of defendant Todd Morgan's position is not accurate. Moreover, the filing of a pretrial motion falls within the automatic exclusion provision of the Speedy Trial Act, *see United States v. Tinklenberg*, 563 U.S. 647, 650 (2011), and the Court does not agree that it can be said that the motions filed by Defendants were filed as a result of government misconduct (Dkt. 435 at 39). It is apparent that defendant Robert Morgan's counsel was preoccupied with other matters until at least late October 2019, and therefore the motion to extend the pretrial motion deadline on November 15, 2019, was due to defense counsel needing more time because they had not devoted the necessary time to prepare pretrial motions up until that point. That motion for an extension had nothing to do with the government's failure to produce discovery from the three computers or Todd Morgan iPhone—facts that were not known at the time the motion was filed.

Thus, the Court concludes that pursuant to the express terms of the Magistrate Judge's interest of justice exclusion order, the clock was stopped until August 1, 2019, at which point it started to run because of the government's failure to provide Rule 16 discovery within its possession by the July 31, 2019, deadline. The clock continued to run until defendant Robert Morgan filed his motion for an extension on November 15, 2019, and it remained automatically stopped thereafter because of various pending motions filed by Defendants.

appropriate format in February 2019, after the DPP was filed.  In other words, on May 29, 2019, when the Magistrate Judge put in place the condition of voluntary discovery to be produced by July 31, 2019, he did this with an understanding that electronic discovery up until that point had complied with the DPP.  On the other hand, in the discussions with the government about implementing this condition, the Magistrate Judge stated that the condition would apply to the material "which is in the government's possession, which is being put together pursuant to a protocol."  (Dkt. 53 at 15).

In any event, the Court need not resolve that issue because of its findings with respect to the government's failure to produce the three computers and iPhone.  In other words, the clock started running on August 1, 2019, and therefore it is irrelevant to the Court's analysis concerning the expiration of the clock whether noncompliance with the DPP also caused the clock to run.  That said, the issue is relevant to the analysis of whether a dismissal with or without prejudice is warranted, as discussed further below.

Finally, the Court does not agree that any alleged failure by the government to comply with its continuing Rule 16 obligations after the July 31, 2019 deadline, could serve as the basis for a running of the clock.  The discussion at the May 28, 2019 conference was clear that the Magistrate Judge's condition applied to discovery presently within the government's possession, and it did not impact the government's continuing discovery obligations.  (*See id.*).  Again, this issue may be relevant to the analysis of whether any dismissal should be with or without prejudice, but it does not impact the determination of whether the clock expired.

C.   <u>The Dismissal is Without Prejudice</u>

"Congress did not intend any particular type of dismissal to serve as the presumptive remedy for a Speedy Trial Act violation." *United States v. Taylor*, 487 U.S. 326, 334 (1988).   The statute sets forth three factors that a court must consider when deciding whether a speedy trial dismissal should be with prejudice: (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of a reprosecution on the administration of the Act and the administration of justice. 18 U.S.C. § 3162(a)(2).   "In addition to these statutory factors, the Supreme Court has indicated that prejudice to the defendant should also be considered." *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993) (citing *Taylor*, 487 U.S. at 334).

The Court has conducted a careful review of these factors.   It is evident that the government has demonstrated a disturbing inability to manage the massive discovery in this case, and despite repeated admonitions from both this Court and the Magistrate Judge, the government's lackadaisical approach has manifested itself in repeated missed deadlines.   These missed deadlines led the Magistrate Judge to condition his interest of justice exclusion on the government's production of voluntary discovery by July 31, 2019. The government failed to meet that deadline and bears full responsibility for allowing the speedy trial clock to expire—not the least of reasons being that it "missed" and therefore failed to process three of eight computers seized some 18 months earlier.   On the other hand, managing the discovery in this case is a tremendous undertaking and under the best of circumstances, issues surrounding electronic discovery would inevitably arise requiring a back-and-forth between the parties.   Defendants are charged with offenses that are

extremely serious, and on balance the delay and any prejudice suffered by Defendants is not significant enough to warrant a dismissal with prejudice. Accordingly, for the reasons discussed in further detail below, the dismissal on statutory speedy trial grounds is without prejudice.

### 1.   Seriousness of the Offense

It is well-settled that "[w]here the crime charged is serious, the sanction of dismissal with prejudice should ordinarily be imposed only for serious delay." *Bert*, 814 F.3d at 79 (quoting *United States v. Simmons*, 786 F.2d 479, 485 (2d Cir. 1986)) (alteration in original). Serious delay is measured both by facts and circumstances leading to a speedy trial violation and the prejudice to a defendant. *Id*. at 79-80. "Thus, the fact that the underlying offense is serious may be outweighed by the other factors, and the length of the delay may contribute to such a counterweight." *Id*. at 80.

The seriousness of the offense ordinarily examines the charge itself as opposed to "the strength of the government's case or the likely outcome of the proceedings." *Solnin*, 81 F. Supp. 3d at 202 (citation omitted). "To do otherwise would inordinately complicate and extend the analytical process." *United States v. Mancuso*, 302 F. Supp. 2d 23, 26 n.1 (E.D.N.Y. 2004).

While any felony charge is serious, "there are degrees of seriousness." *United States v. Montecalvo*, 861 F. Supp. 2d 110, 115 (E.D.N.Y. 2012) (citation omitted). Moreover, the lack of violence associated with a charged crime will "not necessarily render it non-serious." *Id*.

Defendants contend that the charges in this case do not rise to the level of significant seriousness because they are non-violent in nature and there are no allegations in the Superseding Indictment of any actual losses suffered by the banks. (*See*, *e.g.*, Dkt. 217 at 22-23). The Court disagrees. The allegations in the Superseding Indictment depict a wide-ranging and massive fraud scheme that, if true, wholly undermined the integrity of the mortgages and funding obtained by Defendants. The charges are serious—extremely serious—with significant penalties that Defendants would be facing if convicted. Accordingly, the Court concludes that this factor weighs heavily against a dismissal with prejudice.

2.     Facts and Circumstances Leading to Dismissal

The Second Circuit has explained that this second statutory factor considers more than just the reason for the delay in the case—rather, a district court must also take into account "the length of the delay and whether any neglect that caused the delay at issue is part of an ongoing pattern." *Bert*, 814 F.3d at 79 n.5. This factor may "tip in favor of dismissal with prejudice in situations where the delay is attributable to a 'truly neglectful attitude,'" and it does "not always require a finding of 'evil motive.'" *Id.* at 80 (quoting *Taylor*, 487 U.S. at 338). "A factually supported finding of a pattern of neglect, thus showing a truly neglectful attitude, either on the part of the government or the court, may alone suffice to tip the facts and circumstances factor in favor of dismissal with prejudice." *Id.* at 80-81 (internal quotation marks omitted). In addition, "it is firmly established that the length of the delay, as 'a measure of the seriousness of the speedy trial violation,' is a

critical consideration in evaluating the facts and circumstances that led to the dismissal." *Id*. at 81 (quoting *Taylor*, 487 U.S. at 340).

With respect to the length of the delay, the Court has concluded that the speedy trial clock expired by 36 days. Standing alone, this is not significant enough to constitute a serious violation of the Speedy Trial Act warranting dismissal with prejudice. *See United States v. Hernandez*, 863 F.2d 239, 244 (2d Cir. 1988) (explaining that 14 day delay bordered on *de minimis* and stating that "short delays of the kind present here do not become 'serious' violations of the Speedy Trial Act unless there is some resulting prejudice to the defendant."); *United States v. Teman*, No. 19 CR. 696 (PAE), 2019 WL 7041646, at *9 (S.D.N.Y. Dec. 20, 2019) ("There is no bright-line test for when a delay is sufficiently long to require dismissal with prejudice. But the 55-day delay here falls short of being of such sheer length as to be a dominating consideration dictating that extreme outcome." (internal quotation marks omitted)); *cf. Solnin*, 81 F. Supp. 3d at 204 (finding unexcluded delay of eight months was "not insubstantial" and could "[u]nder certain circumstances . . . warrant dismissal of the relevant counts of an indictment with prejudice").

With respect to a pattern of neglect, the Court first addresses the history of speedy trial issues in this District. This District's history with respect to speedy trial issues is not stellar.[26] More than three decades ago, the Second Circuit expressed chagrin over the

---

[26] There are a number of parties who bear responsibility for the District's speedy trial history, and this Court does not view it as fair or appropriate to place all the blame on the USAO-WDNY. However, when assessing this second statutory factor, the Court must acknowledge this District's speedy trial past and the Defendants in this case should not bear that burden.

proliferation of speedy trial cases arising out of criminal prosecutions in the Western District of New York.  *See United States v. Kiszewski*, 877 F.2d 210, 215 (2d Cir. 1989) ("It is disquieting that so many of our recent Speedy Trial Act opinions are in cases coming from the Western District.").  A year later, in *United States v. Giambrone*, 920 F.2d 176 (2d Cir. 1990), the Second Circuit affirmed District Judge Richard J. Arcara's dismissal of an indictment with prejudice, noting that a "cavalier attitude toward speedy trial rights was characteristic of the United States Attorney's Office in the Western District of New York." *Id*. at 181-82.  In its decision, the Second Circuit cited a string of decisions dating back to 1974 where both the appellate and trial courts in this District were "confronted with speedy trial violations by the United States Attorney's office in the Western District."  *Id.* at 182.

More recently, the Second Circuit has held "for the third time in two years that criminal defendants' rights to a speedy trial have been violated in the Western District of New York."  *United States v. Black*, 918 F.3d 243, 248, 266 (2d Cir. 2019) (finding that delay of almost six years in bringing case to trial violated defendants' constitutional rights to speedy trial); *United States v. Tigano*, 880 F.3d 602, 619 (2d Cir. 2018) (finding that nearly seven year delay in bringing case to trial violated defendant's constitutional right to speedy trial); *United States v. Pennick*, 713 F. App'x 33, 35-36 (2d Cir. 2017) (over six year pretrial delay violated defendant's constitutional right to speedy trial).[27]

---

[27]     These cases did not involve violations of the Speedy Trial Act, but rather constitutional speedy trial violations—in each case, involving defendants who were detained in pretrial custody and where the delay in bringing the case to trial exceeded five years.

Against that backdrop, the Court considers the facts and circumstances in this case. First, it was the government's own missed deadlines that caused the Magistrate Judge to issue the conditional interest of justice exclusion.  In other words, had it not been for the government's repeated failures to provide discovery in accordance with the deadlines set by the Magistrate Judge, he would not have conditioned the speedy trial exclusion upon production of voluntary discovery by July 31, 2019.  Second, while this Court agrees with the government that many of the discovery delays were "attributable to difficulties faced by the Government in resolving challenging discovery issues in an immensely complex case," (Dkt. 262 at 32), that excuse cannot reasonably explain the failure to process and produce three of the eight computers and Todd Morgan's iPhone seized in May 2018.  The government has offered no justification for the failure to process those devices other than the fact that they were just "missed."  While the ESI within the seized electronic devices is voluminous, the actual number of seized devices is not substantial—and the Court can only conclude that the government exhibited a truly neglectful approach to its organization of the discovery that led to its failure to process these devices.[28]

The Court does not view the government's management of the electronic discovery as harshly.  No question, there have been some significant missteps.  The government did not reprocess the electronic discovery once the DPP was agreed upon, nor did it arrange for the same vendor to process the discovery utilizing the same software.  Had these steps

---

[28]    The failure to process the Todd Morgan iPhone is slightly more understandable because of the necessary division between the government's filter team and investigation team, but it likewise exhibits negligence on the part of the government.

occurred, the Court believes that many of the electronic discovery issues could have been avoided.  Moreover, there was no justification for the government to initially fail to provide custodian information with the Laptop Production, and there have been inconsistencies in the government's handling of electronic discovery which—while perhaps not a technical violation of the DPP—have created confusion and misunderstandings.   However, electronic discovery is challenging even under the best of circumstances.  In other words, the facts and circumstances cannot be appropriately evaluated without considering the volume of discovery and the enormous efforts needed to manage an electronic production of this nature.

Moreover, the Court also takes into account the failure of Defendants to raise any issues with respect to electronic discovery until after the speedy trial clock had expired.  The record in this case establishes that no issues were raised by any defendant with respect to discovery produced by the government between July 31, 2019, and October 30, 2019.  (*See* Dkt. 150 at 14).  With respect to the defendants who were the subject of the initial Indictment, including Todd Morgan, the record establishes that the government had not received any communication regarding discovery issues since the completion of the discovery in connection with that initial Indictment in February 2019, up until issues were raised at the November 25, 2019 status conference.  (*Id.*).  In fact, there is no proof in the record that either counsel for defendant Michael Tremiti or counsel for defendant Frank Giacobbe has ever identified any specific issues to the government with respect to electronic discovery.

- 63 -

During oral argument, counsel for defendant Robert Morgan suggested that it would create a "serious appellate issue" for the Court, in assessing whether dismissal with prejudice was appropriate, to consider the government's claims that Defendants were dilatory in raising any issues with the government concerning the adequacy of the electronic discovery (and certainly never did so until more than 70 days after the July 31, 2019 deadline). The Court questions the merit of defense counsel's position in that regard, particularly since the Supreme Court has recognized that a defendant's "culpable conduct" and "responsibility for the failure to meet the timely trial schedule in the first instance" are relevant factors when considering pursuant to § 3162(a)(2) the facts and circumstances leading to a speedy trial violation. *Taylor*, 487 U.S. at 340.

But here, the Court does not consider Mr. Rothenberg's statements at the appearance on May 29, 2019, that electronic discovery had been produced in the appropriate form in February 2019; or the failure of defense counsel to raise any concerns about the adequacy of the electronic discovery until well after the 70-day window from the deadline set by the Magistrate Judge for the production of voluntary discovery; or even the inconsistent statements made by defense counsel to the Court throughout these proceedings that all metadata issues had been resolved, when in fact they really had not been, to represent some sort of culpable or dilatory conduct on the part of Defendants that should be held against them when assessing the facts and circumstances leading to the speedy trial violation. Rather, the Court views this information as relevant because it demonstrates the complexities and difficulties associated with electronic discovery of this magnitude. It is clear that as Defendants prepared for the hearing in this matter in an effort to marshal their

evidence of the government's discovery failures, they discovered even more issues about the integrity of the electronic production than they had initially understood, so that many issues were raised at the evidentiary hearing that had never been previously brought to the government's attention.  Again, this demonstrates the complexities of the issues.  While Defendants cannot be blamed for the evolution of their understanding of the issues surrounding the electronic discovery, the Court must also assess the failures and missteps in this case on the part of the government through the lens of the complications associated with electronic discovery.

At the oral argument, defense counsel characterized the government's conduct in this case with respect to discovery as reactive versus proactive, and the Court agrees.  But the Court cannot conclude that the conduct has been undertaken in bad faith.[29]  The record does not support any conclusion that the government's conduct has been undertaken to gain any sort of tactical advantage—indeed, the exact opposite has been the case—and there has never been any suggestion that the government has any different metadata in its electronic discovery platform than the defense.

---

[29]    Defendant Todd Morgan argues that dismissal with prejudice is appropriate, among other reasons, because there is a "strong inference of government misconduct at the time the search warrants were executed"—namely, "[a]lthough search warrant applications are made *ex parte*, somehow the media, including numerous television stations, were given advance notice of the search and were present at the time the warrants were being executed and the search was being conducted."  (Dkt. 231 at ¶¶ 13-14).  Not only is the record not developed in this regard, but even if true, this alleged misconduct has nothing to do with the speedy trial issues.

In sum, the Court views this second statutory factor as tipping in favor of a dismissal with prejudice, but not weighing strongly in that direction. The Court reaches this conclusion primarily in view of the government's repeated missed deadlines resulting in the conditional interest of justice exclusion, the government's failure to produce by the July 31, 2019 deadline any material from several of the devices seized over a year earlier, and the government's failure to approach its electronic discovery obligations with the necessary vigor required to manage ESI of this volume. However, given the fact that the clock expired by only 36 days, the lack of bad faith by the government or delay intended to gain a tactical advantage, and the natural challenges encountered by any party even under the best of circumstances in managing electronic discovery of this volume, the Court concludes that this factor tips in favor of a dismissal with prejudice, but it does not weigh heavily in favor of such a dismissal.

Moreover, as noted above, the Court appreciates that Defendants have cited to additional discovery failures on the part of the government—including its handling of privileged information (that is the subject of a pending motion to dismiss certain counts), its alleged failure to apply appropriate search terms when pulling data from the ESI in order to comply with Rule 16, and its alleged failure to comply with its continuing discovery obligations promptly. The record is not fully developed with respect to some of those issues, but even if all unresolved issues in that regard were construed in favor of Defendants, the Court would reach the same conclusion—namely, that consideration of the facts and circumstances tips in favor of a dismissal with prejudice, but it does not weigh heavily in favor of such a dismissal, and ultimately, a dismissal with prejudice on

consideration of all the necessary factors would not be appropriate.  These additional alleged discovery failures, like those discussed in detail above, appear largely to be the result of the inherent difficulties in sorting, processing, and producing massive volumes of ESI, and not of any bad faith or tactical considerations by the government.

### 3.   The Impact of Reprosecution on the Administration of the Speedy Trial Act and the Administration of Justice

Some of the same factors that are considered under the second statutory element are also relevant to consideration of the third factor.  As explained by the Second Circuit:

> A pattern of disregard for speedy trial rights is also detrimental to the administration of the criminal justice system since delays risk the loss of important evidence, and repetitive prosecutions on the same charges cause wasteful replication of effort.  Such delays also harm both the interest of the defendant and the interest of the public, for if the defendant is innocent, he has an interest in early vindication; and if he is guilty, the public has an interest in expeditious punishment for a variety of reasons, including the fact that the closer in time the punishment is to the crime, the greater its rehabilitative effect.

*United States v. Giambrone*, 920 F.2d 176, 181 (2d Cir. 1990).  In considering this third statutory factor, "district courts should identify and explain the administrative neglect that caused the particular delay at issue, as well as consider any potential administrative changes that might be warranted in light of that violation."  *Bert*, 814 F.3d at 83.

However, with respect to this factor, the Supreme Court has cautioned that while it encourages "district courts to take seriously their responsibility to consider the 'impact of a reprosecution on the administration' of justice and of the Act," and that while a dismissal with prejudice will always send a "stronger message" than dismissal without prejudice and "is more likely to induce salutary changes in procedures," dismissal with prejudice is not

required for every violation—and in fact, to interpret the Act in that manner would render the other factors superfluous. *Taylor*, 487 U.S. at 342 (quoting 18 U.S.C. § 3162(a)(2)). As explained by the Supreme Court:

> Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds. Given the burdens borne by the prosecution and the effect of delay on the Government's ability to meet those burdens, substantial delay well may make reprosecution, even if permitted, unlikely.

*Id*. at 342.

As noted above, consideration of the second statutory factor tips in favor of a dismissal with prejudice. However, the same cannot be said when considering this third factor—and that is primarily because of the unique nature of the speedy trial order issued in this case. No party has cited the Court to a case involving a conditional interest of justice exclusion like the one that was entered in this case. By issuing a speedy trial exclusion like the one that was issued here, the Magistrate Judge necessarily incorporated the government's Rule 16 compliance into any speedy trial considerations. Dismissal of an indictment with prejudice for failure to comply with Rule 16 would be a drastic remedy. Rule 16(d)(2) sets forth the remedies that a court may impose for failure to comply with the rule's requirements, and dismissal is not one of the remedies expressly articulated.

Certainly, when a government violates Rule 16, a district court "has broad discretion in fashioning a remedy." *United States v. Walker*, ___ F.3d ___, No. 18-1933, 2020 WL 5490829, at *8 (2d Cir. Sept. 11, 2020). In considering whether a district court appropriately exercises its discretion in granting a particular remedy, if any, for a Rule 16

violation, the factors considered are "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Lee*, 834 F.3d 145, 159 (2d Cir. 2016) (quoting *United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976)) (finding that district court did not abuse discretion in admitting the defendant's oral statement that was not previously disclosed). To prove substantial prejudice under this framework, a defendant "must demonstrate that the untimely disclosure of the [evidence] adversely affected some aspect of his trial strategy." *Walker*, 2020 WL 5490829, at *7 (quoting *Lee*, 834 F.3d at 158) (alteration in original). Where late disclosure occurs, it may be appropriate to grant a continuance, *see United States v. Monsanto Lopez*, 798 F. App'x 688, 690-91 (2d Cir. 2020) (finding that even if Rule 16 violation occurred, district court "was well within its broad discretion" to grant a continuance of the trial as opposed to excluding the evidence), or in a particularly egregious case, a new trial may be warranted, *see United States v. Vinas*, 910 F.3d 52, 54 (2d Cir. 2018) (district court erred in denying defendant's request for new trial where the government's inaccurate pre-trial disclosure under Rule 16(a)(1)(A) caused the defendant to forgo moving to suppress an inculpatory statement introduced at trial that he made before receiving *Miranda* warnings).

However, it has been suggested that only where there has been a chronic refusal by the government to turn over discovery material in bad faith, is it appropriate to consider linking those failures to the running of the speedy trial clock. *See United States v. Esquilin*, 205 F.3d 1325, 2000 WL 232162, at *2 (2d Cir. 2000) (table decision) (rejecting argument that speedy trial clock should have run while motion to dismiss was pending that was filed

after late production of Rule 16 discovery by government, where prosecutor had forgotten about discovery material and material had been misplaced, but government did not withhold information or cause delay in bad faith); *United States v. Anderson*, 902 F.2d 1105, 1109 (2d Cir. 1990) (rejecting argument that speedy trial time was not excluded during pendency of motion brought because of government's failure to comply with discovery provisions of pretrial order, where government's refusal to turn over discovery was not chronic and in bad faith).

This is not a situation where the Court concludes that the government has acted in bad faith or where disclosures have been made during trial (or even on the eve of trial). The reason that the government's discovery missteps are the subject of a motion to dismiss the Superseding Indictment on speedy trial grounds is because of the unique interest of justice exclusion issued in this case. Granted, the government voiced no objection to the Magistrate Judge's imposition of a "club"—nor did the government take affirmative steps to follow up to ensure the status of the speedy trial clock. Moreover, there is no question that this Court and the Magistrate Judge have both repeatedly expressed frustration with the government's discovery compliance at various points in time during this litigation. Nonetheless, even with consideration of this District's speedy trial history, the Court does not believe that the impact of reprosecution on the administration of the Speedy Trial Act and the administration of justice countenances in favor of a dismissal with prejudice under the particular circumstances present here. Rather, the Court views consideration of this factor as tipping against a dismissal with prejudice—not weighing heavily against such a dismissal, but instead tipping against it. *Cf. United States v. Reichberg*, No. 1:16-CR-468-

GHW, 2018 WL 6599465, at *9 (S.D.N.Y. Dec. 14, 2018) (although "the Court has shared some of Defendants' concerns about the adequacy of the Government's discovery and other productions," denying the motion to dismiss indictment on ground that the discovery failures caused the speedy trial clock to run).

### 4.    Prejudice to Defendants

"'Although the absence of prejudice [to the defendant] is not dispositive,' it can be 'another consideration in favor of permitting reprosecution.'"   *Bert*, 814 F.3d at 81 (citations omitted).  Delay impacts this analysis, as the lengthier the delay "the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty[.]" *Taylor*, 487 U.S. at 340.  Moreover, "a district court is entitled to construe a defendant's delay in articulating his cognizance of the violation as evidence that he did not suffer actual prejudice," but this fact is "not fatal to the defendant's claim, and it is not the end of the court's inquiry into prejudice."  *Bert*, 814 F.3d at 82.

The Second Circuit has identified two types of prejudice relevant to the inquiry: (1) trial prejudice which impacts a "defendant's ability to mount a defense at trial," and (2) non-trial prejudice.  *Id*.  Non-trial prejudice has been described by the Supreme Court as follows:

> Inordinate delay between public charge and trial, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

*Taylor*, 487 U.S. at 340-41 (citations, internal quotation marks, and original alterations omitted).

Defendants have not seriously mounted an argument that the delay in this case has led to trial prejudice.  In November 2019, the Court scheduled the trial to commence in January 2021, with no request or argument by any defendant that the trial should be held sooner.  Rather, reflective of the complexities at play in this case, Defendants have repeatedly requested adjournments of the pretrial motion deadlines—indeed, requesting a six month adjournment before they apparently became aware of any discovery issues in this case (or at least the extent of those issues) and even now, that deadline has been extended at Defendants' request to October 31, 2020.  (Dkt. 406; Dkt. 407).  At oral argument on September 10, 2020, defense counsel cited to the recent death of Larry Hill as supporting an argument for lost evidence and trial prejudice, but there is nothing in the record suggesting that Mr. Hill would have provided evidence helpful to the defense—and in any event, his death occurred before the scheduled trial date, which again, was set with the consent of Defendants.  Thus, the Court concludes that there is no legitimate finding of trial prejudice here.

In support of their speedy trial motions, Defendants largely focus on the non-trial prejudice.  Defendant Robert Morgan argues that he, his family, and affiliates have "faced severe personal, business, and reputational harm throughout this proceeding, since the beginning of the government's highly-publicized investigation," and that the government's actions have "created a cloud of uncertainty in the marketplace, which has severely restricted Mr. Morgan's ability to effectuate transactions involving Morgan-affiliated properties . . . in order to preserve the value of those properties and ensure they remain under high-quality management, to the benefit of residents and the community at large."

(Dkt. 217 at 31).  Defendant Robert Morgan also focuses on the prejudice that he suffers because of his health challenges.  (*Id.* at 32 ("Mr. Morgan is a paraplegic grandfather, husband, and father with serious and sometimes life-threatening health complications.  Not only does the stress of a future prosecution impact[] his health, but he also has greater reason to feel anxiety and concern about the possibility of incarceration, since such limitations on his freedom would impact the medical options available to him.")).

Defendant Todd Morgan contends that he has been prejudiced by the delay by suffering "overwhelming anxiety and stress" and damage to his reputation which has negatively impacted "all of Todd Morgan's business relationships."  (Dkt. 231 at ¶¶ 52-55).  Moreover, although no defendant is detained in pretrial custody, defendant Todd Morgan argues that the restrictions on his liberty through pretrial supervision have prejudiced him.  (*Id.* at ¶ 56).[30]  In addition, defendant Todd Morgan cites to the substantial costs incurred in connection with the discovery issues.  (*Id.* at ¶ 57; *see* Dkt. 435 at 55 (defendant Todd Morgan stating: "Hosting fees for Todd Morgan alone, as well as the additional costs of D4's analysis of the Government's productions and its preparation and participation in this hearing, run well into the six figures.")).

Defendant Michael Tremiti argues that in addition to the physical, mental, and emotional strain associated with being a target of this prosecution, he has become "virtually unemployable" since being charged in this case and that unlike other defendants, he does not have significant assets to finance his defense of this litigation.  (Dkt. 234 at 5).

---

[30]     Defendant Todd Morgan is subject to pretrial supervision, which includes restrictions on his travel and required the posting of a $25,000 signature bond.  (Dkt. 10).

Defendant Frank Giacobbe contends that his ability to earn a living and reputation have similarly suffered since being named as a defendant in this case.  (Dkt. 237 at ¶ 27).

The problem with much of Defendants' cited prejudice is that it largely relates to being prosecuted in this criminal case—as opposed to prejudice directly related to the fact that the speedy trial clock expired when the government failed to produce discovery by the July 31, 2019 deadline.  Certainly, any delay can contribute to or exacerbate the prejudice identified by Defendants as a result of being prosecuted in this case—but in the end, it was 36 days that expired from the speedy trial clock.  Moreover, the most blatant failure to comply with the Magistrate Judge's discovery deadline occurred with the failure to produce the Laptop Production—which was identified in November 2019, and which was produced in December 2019.  In other words, the Court would be hard-pressed to conclude that this delayed production resulted in any prejudice to Defendants, especially when it appears fairly evident that their counsel had not meaningfully reviewed the discovery that had already been produced.  Similarly, while the Court does not doubt that an enormous amount of time and money has gone into managing the electronic discovery and then preparing for the evidentiary hearing necessitated by the motions to dismiss, electronic discovery in a case of this magnitude would inevitably cost time and money, and as noted above, while the Court concluded that the government failed to comply with the DPP in some respects, it did not agree with Defendants that the errors were as egregious as they claimed.

Thus, the Court concludes that the prejudice to Defendants, which is of the non-trial nature, is not significant enough to warrant a dismissal with prejudice.  The Court views this factor as weighing against a dismissal with prejudice—not weighing heavily against

such a dismissal, but nonetheless weighing against it (and not just tipping in the direction of a dismissal without prejudice).

In the final analysis, on balance and considering all of the factors as discussed above, the Court concludes that a dismissal without prejudice is the appropriate remedy for the violation of the Speedy Trial Act. To be clear, the government has allowed this question of dismissal with or without prejudice to be a closer question than it should be—but in the end, it is not a close question.

D.   Defendants' Constitutional Speedy Trial Rights Have Not Been Violated

"The Sixth Amendment guarantees that, in all criminal prosecutions, the accused shall enjoy the right to a speedy trial." *Doggett v. United States*, 505 U.S. 647, 651 (1992) (internal quotation marks and original alterations omitted). The Supreme Court has set forth four factors for consideration in deciding whether the Sixth Amendment has been violated by a pre-trial delay: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "These factors 'must be considered together with any other circumstances as may be relevant' and 'have no talismanic qualities.'" *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012) (quoting *Barker*, 407 U.S. at 533). In comparison to a statutory speedy trial violation, if a constitutional violation is established, dismissal of the charge with prejudice is the mandatory remedy. *See Strunk v. United States*, 412 U.S. 434, 439-40 (1973); *United*

*States v. Pennick*, 713 F. App'x 33, 35 (2d Cir. 2017) ("When the [constitutional speedy trial] right is violated, the only remedy is dismissal of the charges with prejudice.").

### 1.   First *Barker* Factor—The Delay

> "The first of [the *Barker* factors] is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."

*Doggett*, 505 U.S. at 651-52 (quoting *Barker*, 407 U.S. at 530-31). "It comes as no surprise that courts have been unable to define 'presumptively prejudicial.'" *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) (noting that one commentator had discerned "a general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not."); *see also Doggett*, 505 U.S. at 652 & n.1 (noting that delay approaching one year is generally sufficient to warrant further inquiry); *McCray v. Capra*, No. 9:15-cv-01129-JKS, 2017 WL 3836054, at *10 (N.D.N.Y. Aug. 31, 2017) ("Here, [the defendant]'s trial began roughly 7 months after his initial arrest. [The defendant] thus fails to show that the delay is 'presumptively prejudicial.'"); *United States v. Bender*, No. 02 CR MISC 40 JCF, 2003 WL 282184, at *2 (S.D.N.Y. Feb. 7, 2003) (finding that a delay of seven months "falls well short of being presumptively prejudicial"). Nevertheless, even if a delay is presumptively prejudicial, thus triggering the speedy trial analysis, this does not mean that a violation occurred where evaluations of all the circumstances justify the delay. *See*, *e.g.*, *United States v. Ghailani*, 733 F.3d 29, 46-48 (2d Cir. 2013) (five-year delay); *United States v. Blanco*, 861 F.2d 773, 777-78 (2d Cir.

1988) (10-year delay); *Rayborn v. Scully*, 858 F.2d 84, 93-94 (2d Cir. 1988) (more than seven years).

Here, the Court easily concludes that the delay faced by defendants Todd Morgan and Frank Giacobbe is presumptively prejudicial.  They were originally indicted in May 2018, they filed motions to dismiss on speedy trial grounds over 20 months later in February 2019, and it has now been over two years since they were originally indicted.  By contrast, it is a closer question whether the delay faced by defendants Robert Morgan and Michael Tremiti is presumptively prejudicial.  They were originally indicted in May 2019, they filed their motions to dismiss on speedy trial grounds just over eight months later, and it has now been over a year since they were indicted.

Nonetheless, for purposes of this Decision and Order the Court assumes that the delay faced by all Defendants has been presumptively prejudicial.  However, the delay has not been uncommonly long given the complexities of this case—and in fact, the trial date of January 2021, was agreed to by all parties and that date has not yet occurred.  "The length of the delay here was less extensive than that tolerated in other cases."  *United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990) (finding delay of 26 months did not violate Sixth Amendment right to speedy trial).  This case is very complex, as presumably even Defendants would concede.  (*See* Transcript of Proceedings held on 6/5/2019, *SEC v. Morgan*, Case 1:19-cv-00661-EAW, Dkt. 27 at 44-45 (W.D.N.Y. June 5, 2019) (transcript of oral argument before the undersigned, wherein counsel for defendant Robert Morgan explained: "I think everyone would agree, it's [a] 114 count indictment involving 12 or 13 years of history.  I don't regularly practice in this district, I would venture to guess it's one

of the largest cases ever brought in this district.  It's large anywhere.")).  Given the

complexity of this case when measured against the length of any delay, the Court finds that

this factor does not weigh against the government.  Accordingly, with respect to this first

factor, the Court considers it to trigger the speedy trial analysis, but it does not consider it

to weigh in favor of dismissal.

### 2.   Second *Barker* Factor—Reason for Delay

With respect to the second factor:

> Although no single *Barker* factor is a necessary or sufficient condition to the
> finding of a deprivation of the right of speedy trial, the second factor—reason
> for delay—is often critical.  The Sixth Amendment is rarely violated by delay
> attributable entirely to the defendant, or by delay that serves some legitimate
> government purpose.

*United States v. Moreno*, 789 F.3d 72, 79 (2d Cir. 2015) (citation and internal quotation

marks omitted). There are three types of Sixth Amendment speedy trial delay: deliberate,

neutral and valid. *See Barker*, 407 U.S. at 531.  Deliberate delay, which is delay intended

to confer an advantage over a defendant, weighs most heavily against the government.  *Id*.

Neutral delay, resulting from government negligence and overcrowded court dockets, is

less weighty.  *Id*.; *see Vasquez*, 918 F.2d at 338  (no Sixth Amendment violation despite

apparent government negligence in failing to expedite a mental competency examination).

*But see Flowers v. Warden*, *Conn. Corr. Inst.*, 853 F.2d 131, 134 (2d Cir. 1988) (a 17-

month delay due to government dysfunction "might well merit dismissal" in case where

greater prejudice to a defendant or "some bad faith by the prosecution" is established).

Delay is considered "valid" delay if it is reasonable pretrial delay, *see*, *e.g.*, *Vassell*, 970

F.2d at 1165 (seven-month delay in complex case to negotiate plea and cooperation

agreement with co-defendant); delay caused by proceedings in another jurisdiction, *see*, *e.g.*, *United States v. Jones*, 91 F.3d 5, 8-9 (2d Cir. 1996); or delay attributable to the defendant, *see*, *e.g.*, *Davis v. Kelly*, 316 F.3d 125, 127 (2d Cir. 2003) (57-month delay caused by "repeated replacements of the defendant's attorney at his request" (citation omitted)).

Here, viewing the delay from the perspective of the earliest indicted Defendants, there has been delay from May 22, 2018, through October 8, 2020—less than 29 months. The delay is less for defendants Robert Morgan and Michael Tremiti, who were indicted less than 17 months ago.

The delay from March 2020 through July 2020 was necessary due to the COVID-19 pandemic, as the evidentiary hearing was originally scheduled to commence in March 2020, but was postponed with all parties' consent to July 2020 because of the pandemic and the health and safety risks associated with it.  Accordingly, four months is plainly "valid" delay.

None of the delay can be considered deliberate delay, as the government's missteps are attributable to its negligence—not for the purpose of gaining a tactical advantage or prejudicing Defendants.  In fact, the record establishes that the discovery maintained in the government's document production platform was the same as what was produced to Defendants, so it is not as though the government was intentionally hiding relevant information in an effort to obtain a tactical advantage.  Moreover, with respect to the 24-25 months of non-COVID delay for defendants Todd Morgan and Frank Giacobbe, and the 12-13 months of non-COVID delay for defendants Robert Morgan and Michael Tremiti,

some of it is attributable to time needed by Defendants to prepare their motions directed to the speedy trial issues (*e.g.*, defendant Robert Morgan indicated at the status conference on November 25, 2019, that a motion would be forthcoming, and he filed it over two months later on January 31, 2020); some of it is attributable to time that the motions were under consideration by the Court (*e.g.,* the Court took the pending motions under advisement after oral argument on September 10, 2020); and plainly some of it was attributable to the time needed for the government to produce the voluminous discovery in this case and for Defendants to review it.

However, even if all of the remaining time (after exclusion of the four months due to the COVID-19 pandemic) was considered neutral delay attributable to government negligence, while not insignificant, it does not rise to the length of delay often considered necessary to justify a constitutional speedy trial dismissal. Nonetheless, it warrants consideration of the other factors.

### 3.   Third *Barker* Factor—Defendants' Assertion of Rights

Whether a defendant is serious about wanting a speedy trial is the third *Barker* factor. *See Barker*, 407 U.S. at 530. A "lack of timeliness, vigor or frequency" in asserting the right does not waive the claim, but it undercuts it. *See Rayborn v. Scully*, 858 F.2d 84, 93 (2d Cir. 1988); *Garcia Montalvo v. United States*, 862 F.2d 425, 426 (2d Cir. 1988) (no violation where defendant raised issue six years after trial). *But see Doggett*, 505 U.S. at 652-54 (post-arrest assertion timely more than eight years after indictment filed because defendant had been unaware of indictment).

The third *Barker* factor—Defendants' assertion of their speedy trial rights—favors the government.  Defendants did not press any speedy trial issues until November 2019, after the bulk of the delay occasioned by the discovery issues had elapsed.  *See United States v. Shine*, No. 17-CV-28-FPG, 2018 WL 3737877, at *3 (W.D.N.Y. Aug. 7, 2018) (finding third *Barker* factor favored the government where the defendant "did not assert his right to a speedy trial until he filed his first speedy trial motion[.]").  Indeed, the only party who appeared legitimately concerned about speedy trial issues prior to November 2019, was Magistrate Judge Schroeder.  Moreover, when Defendants did assert speedy trial rights in November 2019, it was linked to their statutory speedy trial claim that the clock had expired—Defendants have never voiced a desire to proceed to trial more quickly than the Court scheduled.  At this stage, Defendants still have not filed pretrial motions and the Court rejects any suggestion that those motions could not be filed because of outstanding discovery issues—in fact, some of the motions that defense counsel have identified that they intend to file have nothing to do with discovery.  As a result, consideration of this third factor does not weigh in favor of dismissal.

### 4.    Fourth *Barker* Factor—Prejudice

With respect to the fourth *Barker* factor, "[e]xcessive pretrial delay can inflict three kinds of cognizable prejudice: (i) oppressive pretrial incarceration, (ii) anxiety and concern of the accused, and (iii) the possibility that the defense will be impaired."  *Moreno*, 789 F.3d at 81 (citation and internal quotation marks omitted).  The last of these concerns is "the most serious," because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Id.* (citation and internal quotation marks omitted).

However, the presumption of prejudice inherent in a sufficiently lengthy delay also may be enough to prevail on a Sixth Amendment claim even absent "proof of particularized prejudice." *Doggett*, 505 U.S. at 655, 657-58 (right to speedy trial violated by eight-and-one-half-year delay between indictment and arrest). Prejudice that is merely conjectural does not suffice. *See Moreno*, 789 F.3d at 81 (possibility that defendant would no longer recall certain phone conversations was belied by conversations having been recorded and "thus fully preserved[,]" and failure to recall context "may [also] be said of the government's witnesses"); *see also Barker*, 407 U.S. at 521 (fading memories may "work to the accused's advantage").

Here, when considered in the context of alleged constitutional violations, Defendants' claims of prejudice are unpersuasive and do not weigh in favor of finding a constitutional speedy trial violation. Certainly, Defendants have faced the stress and anxiety normally attendant to any criminal prosecution, but there is no evidence that their defense will be impaired, nor have they faced oppressive pretrial incarceration. Thus, the Court concludes, based on its consideration of all the *Barker* factors, that a constitutional speedy trial violation has not occurred here.

## III.   CONCLUSION

For the foregoing reasons, the Superseding Indictment is dismissed without prejudice because the speedy trial clock expired, but to the extent that Defendants argue the dismissal should be with prejudice or their constitutional speedy trial rights have been violated, the Court disagrees. Therefore, the Court grants in part without prejudice and denies in part defendant Robert Morgan's motion to dismiss (Dkt. 216), defendant Todd

Morgan's motion to dismiss (Dkt. 231), defendant Michael Tremiti's motion to dismiss (Dkt. 234), and defendant Frank Giacobbe's motion to dismiss (Dkt. 237); and the Court grants the motions of defendant Frank Giacobbe to join in the arguments of his co-defendants with respect to these pending motions (Dkt. 248; Dkt. 455).   Furthermore, defendant Robert Morgan's motion to dismiss Counts 1, 38, 39, 61, and 62 of the Superseding Indictment (Dkt. 322) and motion to compel (Dkt. 439) are denied as moot. The Clerk of Court is directed to dismiss this case as to defendants Robert Morgan, Todd Morgan, Michael Tremiti, and Frank Giacobbe, without prejudice.

        SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated:        October 8, 2020
              Rochester, New York